GENERAL ENGINEERING CORPORATION, Plaintiff

v.

VIRGIN ISLANDS WATER AND POWER AUTHORITY,
Defendant

Civil No. 1985/182

CARIBBEAN ENERGY COMPANY, INC., Plaintiff

v.

SOUTH SHORE ALUMINA, INC., ASHLEY ANDREWS, VIR-
GIN ISLANDS WATER AND POWER AUTHORITY, STEPH-
ANOS O'REILLY, CECIL GEORGE, WILLEM WESTER-
BAAN AND VICTOR SCHNEIDER, Defendants

Civil No. 1985/202

District Court of the Virgin Islands

Div. of St. Croix

October 28, 1985

FREDERICK G. WATTS, ESQ., St. Thomas, V.I., and EUGENE F. BAN-
NIGAN, RICHARD BOURNE-VANNECK, ETHAN GREENBERG, ESQS.
(LORD, DAY & LORD), New York, N.Y., U.S.A., *for plaintiff Carib-
bean Energy Co., Inc.*

WARREN B. COLE, ESQ., SCOTT SILVERLIGHT, ESQ. (ISHERWOOD,
HUNTER & COLIANNI), Christiansted, St. Croix, V.I., *for plaintiff
General Engineering Corporation*

SAMUEL H. HALL, ESQ., St. Thomas, V.I., *for defendants Virgin
Islands Water & Power Authority, Stephanos O'Reilly, Cecil
George, Willem Westerbaan and Victor Schneider*

EDWARD HASKINS JACOBS, ESQ., DOUGLAS BRADY, ESQ., Christian-
sted, St. Croix, V.I., *for defendants Ashley Andrews and South
Shore Alumina, Inc.*

O'BRIEN, *Judge*

## MEMORANDUM OPINION

These consolidated cases involve multiple challenges to a major
contract between an arm of one of the nation's largest investment

banking firms and the Virgin Islands Water and Power Authority ("WAPA"). The outcome may well determine how the electric power needs of St. Croix will be met into the 21st Century. Having heard six days of testimony, considered nearly 200 trial exhibits and reviewed several hundred pages of legal memoranda, we conclude that the contract in question is legal, binding and enforceable. Accordingly, a permanent injunction will issue restraining any interference with the rights of the parties thereunder and its implementation.

## I. THE PARTIES AND PEOPLE INVOLVED

On May 23, 1985, WAPA entered into an agreement to buy large quantities of power and steam for the next twenty years ("the contract"). Events before and after that date involve many parties and people. We begin our discussion with an introduction to the movers and shakers who will appear in the factual background following this section.

### A. *The Virgin Islands Water and Power Authority*

WAPA was created in 1964 to take over the operation of a federal agency, the Virgin Islands Corporation, which produced water and power for the Virgin Islands. (1964 Virgin Islands Session Laws, Act No. 1248, p. 378, 30 V.I.C. § 101 et seq.) WAPA is a body corporate and politic constituting a public corporation and autonomous governmental instrumentality of the Government of the Virgin Islands. It has a legal existence and personality separate and apart from the Government. It is governed by a board consisting of nine members, all appointed by the governor. Three of them are his direct appointees from among high level officials of his administration. They are not required to be confirmed by the Legislature. Six of them must be citizens not employed by the government. Their appointments are subject to legislative confirmation. (30 V.I.C. § 103.) During the crucial period from 1983 to August 1985, the board consisted of only six members, four private citizens and two from the government. They were:

> *Herman Richardson*—Virgin Islands Commissioner of Property and Procurement. With five years as commissioner, preceded by 20 years of military service, he has developed an appearance of fearlessness. He is wise to the ways of territorial politics. He was the elected chairman of the board. His attempt to insulate the contract from the vagaries of politics hastened his removal from the board by the governor.

*Roy Adams*—Virgin Islands Director of Planning. He is a graduate in architecture from the University of Pennsylvania, and considered one of the most able and intelligent persons in local government service. He also has a strong sense of personal integrity. He was the point man for the WAPA board on the contract. He was also removed from the Board in August 1985 by the governor.

*Margaret Creque*—the secretary of the WAPA board. She was the chairman of a citizen WAPA watchdog committee prior to her appointment. She is independent and well organized in her approach and an outspoken supporter of the contract. She was removed by the governor and reinstated by the Court in August 1985.

*Benjamin Banks*—the vice chairman of the board. He is a resident of St. Croix who supported the contract. He was also removed by the governor and reinstated by the Court in August 1985.

*John Harvey*—an electrical engineer and board member resident on St. John. He supported the contract, but took a generally passive role in board proceedings. He abstained from voting in August board proceedings which would have led to two different contracts for purchase of power and steam by WAPA.

*Willem Westerbaan*—a long time member of the board. He is a strong-willed and persistent critic of the contract. He is manager of utilities at the Martin Marietta Alumina plant on St. Croix's south shore and experienced in the intricacies of power generation.

After the governor removed certain board members in August 1985, he appointed three high level members of his administration to the WAPA board. They are:

*Stephanos O'Reilly*—the Budget Director for the government. He is outspoken and influential. He was elected chairman of the board to replace Richardson. He and the governor are the principal spokesmen for the administration relative to WAPA matters.

*Victor Schneider*—the Acting Attorney General at the time. He delivered the coup de grace to the removed members. He also presented the Department of Law's legal opinions which supported the governor's removal of these members, and challenged the validity of the contract.

*Cecil George*—the Commissioner of Public Works for the government. He is the brother to WAPA executive director

Raymond George. He provided the necessary vote in support of the Luis administration's position as a WAPA board member, and voted for South Shore's proposal within days of his appointment.

## B. *Donaldson, Lufkin & Jenrette, et al.*

The other party to the contract with WAPA is a wholly-owned subsidiary of Donaldson, Lufkin & Jenrette ("DLJ"), known as Caribbean Energy Co., Inc. ("Caribbean"). DLJ is the twelfth largest international investment banking firm in the country, owned by the Equitable Life Assurance Society of the United States. It has developed a specialty as one of a select few firms engaged in what is called third party cogeneration project financing.[1]

This specialty has developed as electric utilities became so hard pressed financially that they were unable to issue more bonds for capital expenditures, or pledge their credit for the purchase of needed equipment. As will be seen, WAPA fit that category. DLJ became financial advisor to WAPA when it sought to meet its equipment needs using this off-balance sheet financing mechanism. By off-balance sheet it is meant that WAPA would not own the equipment, and thus not pledge its credit, and the capital transaction would legitimately not be shown on the WAPA books. A third party would finance the purchase of, and own, the equipment, and sell the needed power and steam to WAPA.

Only about ten of these projects have been successfully maneuvered through this complex and intricate process. It involves meshing the equipment purchased and integrated into WAPA's existing plant, with financing obtained by the third party who would own the equipment. DLJ has been involved in as many as half of these unique financing arrangements.

The DLJ financial acumen was matched by the technical experience of the Sunlaw Energy Corporation, which is responsible for putting the entire installation in place on WAPA property and seeing to its successful operation. Key personnel associated in this endeavor are:

> *Charles O. Svenson*—a senior vice president of DLJ. He combines a legal background on Wall Street with institutional financing expertise. He directed DLJ's successful efforts to

---

[1] Cogeneration, simply described, is a process about 100 years old whereby the waste heat from an electric power generating system is further utilized to produce steam. Thus the same fuel is used to "cogenerate" both electricity and steam.

442

negotiate the contract and will be responsible for the financing intricacies.

*Robert Danziger*—the president of Sunlaw Energy Corporation. He was formerly associated with the Jet Propulsion Laboratory in Pasadena, California. When Congress gave the green light to third party financing projects by providing tax advantages, he put his talents to work in that field. His written estimates of cost savings to WAPA by the contract were challenged at the trial until he entered the courtroom and testified about them. Opposing counsel backhandedly recognized his expertise in calculating the savings by refraining from any further challenge.

## C. *General Engineering Corporation*

By Virgin Islands standards, General Engineering Corporation ("GEC") is a large general contractor. It does substantial work repairing, servicing and maintaining existing WAPA equipment. GEC formed a joint venture with a large stateside electrical contractor, Harrison International Corporation ("Harrison"), to propose the sale and installation of generating equipment to meet WAPA's St. Croix needs. Harrison is owned by an even larger company, the Commonwealth Group. When its proposal was not accepted, GEC filed one of the actions herein, without Harrison's involvement. It seeks to upset the contract, claiming standing as an unsuccessful bidder and a ratepayer in St. Croix. Leading its effort is:

*James Ronald Brown*—affiliated with both GEC and Harrison. He was strongly critical of the contract and defended the technical aspects of the GEC/Harrison proposal from heavy attack. His contention that WAPA could still issue tax exempt bonds to pay for equipment lifted more than a few eyebrows in the courtroom.

## D. *South Shore Alumina, Inc.*

South Shore Alumina, Inc. ("South Shore"), was formed by an influential group of local citizens. It is their vehicle for the purchase of the huge Martin Marietta alumina plant on St. Croix, which is now mothballed. This plant has its own power generation and water production facilities, now idle since Martin Marietta abandoned the alumina business because of economic conditions.

South Shore saw the opportunity to profitably sell power and water produced by this plant to the Government and/or WAPA, and obtained an option from Martin Marietta while it pursued this

opportunity. Governor Juan Luis supported its proposal and signed such a contract with South Shore even though WAPA had already signed its own contract with DLJ's subsidiary.

The stage was then set for the confrontation which resulted in the lawsuits herein. The principals of South Shore who figure in these matters are:

> *Ashley Andrews*—a lawyer admitted in New York but not the Virgin Islands. He has ready access to the governor at Government House or at home. He is adroit at bringing private businesses together with the Virgin Islands government for various projects.

> *Ann Abramson*—the president of South Shore. She is an active St. Croix businesswoman. She testified that a copy of the WAPA contract happened "to come to me" while lunching at a local restaurant. She then "inadvertently" left it at the offices of South Shore's attorneys. Not coincidentally, between 30% and 40% of this agreement can be found word for word in the South Shore agreement signed by the Governor.

> *Lloyd Williams*—a member of the South Shore group. He is a former majority leader and long time member of the Virgin Islands Legislature, noted for his knowledge of the inner workings of the government at a high level.

### E. *Governor Juan Luis*

Governor Juan Luis first entered elective government service as a member of the Legislature. He was elected lieutenant governor as part of the administration of Governor Cyril E. King in 1974. When Governor King died in office, he became governor by succession. He was elected in his own right in 1978 and 1982. He is not eligible for reelection. 48 U.S.C. § 1591.

Though Governor Luis has had the right to appoint a full complement of members of the WAPA board of his own choosing since 1980, he has never done so. The board which confronted the deteriorating operations and tattered finances of WAPA from 1983 up to August 1985, barely constituted the quorum necessary to make policy decisions.

While the governing board is ostensibly free to make its own policy on behalf of this autonomous public corporation, the realities of its situation prevent it from operating in a vacuum. WAPA has frequently turned to the general treasury of the Government for financial aid. It is natural to assume, therefore, that when the Governor speaks, WAPA board members listen.

444

The fact that they listened to the Governor in July and August 1985, but failed to accede to his wishes, is a key element in the events which followed.

## II. FACTUAL BACKGROUND

### A. *The Crisis Looms*

The WAPA board appointed after 1980 was forced to grapple with a myriad of problems, both financial and technical. Much of the equipment that was inherited from the Virgin Islands Corporation in 1964 was antiquated. The situation in St. Croix had continued to worsen. Little had been allocated for maintenance and repair. The mix of equipment was unsatisfactory and its reliability had deteriorated to the point where WAPA's engineers predicted that St. Croix would face frequent power outages, brownouts and rotating power to consumers within several years.

WAPA engineering chief Donald Francois described the potential for a "complete catastrophe" in a February 27, 1984, report, which also noted: "The deficiencies inherent in St. Croix's power plant system clearly point out the emergency that exists and the need for immediate additional reserve or standby generating units." Various board members who testified at the trial described the situation as "desperate", "urgent", and "precarious".

When considering various solutions to the generating problems, the board confronted another equally serious difficulty. An $8.5 million bond anticipation note held by Chase Manhattan Bank had been repeatedly rolled over by the bank when WAPA could not make payment. On April 14, 1983, the note went into default when Chase refused to bid on its renewal. At the same time, WAPA was faced with stringent restrictions contained in its bond resolution. It could not enter the capital financial markets unless its debt service ratio, i.e. the ratio of revenues to debt service, was maintained at a certain level. WAPA never came close to maintaining the required ratio and was thus barred from further borrowings for capital improvements.[2] The same set of facts prevented lease-purchase of equipment.

In mid-1983, the board was receiving financial advice from another company. Executives of this company mentioned WAPA to executives of DLJ, recognizing the latter's expertise in off-balance

---

[2] Board member Creque also testified that WAPA had operated at a deficit for many years, and ran into a "dead end" everywhere it looked for money. It had not had a clean statement from its auditors for years.

sheet projects for financially strapped utilities. Financial experts had determined that this was the only route open to WAPA to meet the needs of St. Croix consumers. In December 1983, WAPA retained DLJ for a 90-day period as exclusive "agent and/or principal" for the purpose of arranging financing "to suit the needs and specification of the V.I. WAPA." The initial retention letter also noted that "these arrangements may include, but are not restricted to, an operating lease mechanism." The implication was that WAPA would welcome DLJ's proposals, since neither WAPA management or its board had any experience with off-balance sheet financing, or non-recourse third party financing.

Although the language of subsequent retention letters changed, it is uncontroverted that the aims of the DLJ relationship to WAPA and its scope continued as originally intended. DLJ was not to receive any payment from WAPA. It was to be paid by third parties out of any project agreed upon, either by fees, commissions or equity participation in the project.

DLJ quickly came up with one proposal which was within the framework of the third party financing mechanism. DLJ proposed to arrange for the installation of the necessary equipment at WAPA's St. Croix plant. It would be owned by a third party, and WAPA would purchase power to meet its needs.

This was the same formula for third party ownership and financing which ultimately formed the basis of the May 23, 1985, contract. But the WAPA staff rejected the proposal because it was dissatisfied with the equipment proposed. Mid-1984 arrrived with no solution in sight.

## B. *The WAPA Board Acts*

WAPA's staff, over the months, had accumulated a number of proposals volunteered by equipment manufacturers and contractors, including Harrison. In the past, however, WAPA engineers felt that it had suffered from poor results by such informal dealings. It decided to put the search for a solution on a more formal footing. It prepared a draft document for issuance to interested manufacturers and contractors and submitted the document to the board.

The board, however, considered the document too rigid and inflexible, akin to an Invitation for Bids. Known as an IFB, this is a structured bid document which locks the parties into their bids, and WAPA into the position of accepting a bid as offered without significant modification. The board decided to restructure the document into a Request for Proposals ("RFP").

In competitive bidding parlance, an RFP asks for proposals of a less specific nature, leaving room for subsequent alteration and modification of the original proposal by negotiations. The board considered this necessary because it was embarking on a new task . . . to meet the power generating needs of St. Croix without pledging its credit in any way. Flexibility was its byword.[3]

The document as issued reflects the unfamiliarity of both board and management with third party financing of cogeneration facilities. Under such an arrangement, it is power and steam which is sold to the utility, not the equipment itself. WAPA management and board labored hard to produce an RFP which pointed proposers in that direction, but the RFP contains various inconsistencies. For instance, at one point it directed proposers to state the terms of payment in the proposal, and went so far as to note:

> Payments to be in accordance with a negotiated agreement based on purchase of power or lease purchase agreement.

But other parts of the same RFP provided that title to the work would pass to WAPA upon formal acceptance based on successful completion of a 24-hour performance test. This is the kind of language usually included where a purchase of equipment is contemplated. DLJ did not play any role in drafting the RFP.

There is no misunderstanding, however, on what equipment package WAPA sought. It wanted proposals for a complete 20 megawatt generating facility involving two 10-megawatt engines. The proposals were also to include complete installation on WAPA's property, including design and construction, of the building to house the facility.

Brown of GEC was critical of the RFP in many respects, and compared it unfavorably with others he had seen. But he made one important concession: he clearly understood that the RFP contemplated a purchase of power, believing however that this would be a subject of later negotiation. The GEC/Harrison proposal which he prepared and submitted did not contain any proposal for the sale of power to WAPA.

Inconsistent as the RFP was, it did not appear to confuse other proposers. The deposition of the executive of another proposer,

---

[3] The WAPA technical staff, who prepared the original document, found it difficult even at the trial to accept this need for flexibility. Chief Engineer Francois still thought WAPA should purchase its own equipment, a notion which flies in the face of financial reality. The board, in its own halting way, did come to grips with that same reality.

Stork-Werkspoor Diesel of The Netherlands, was received in evidence. The executive, Peter Hokkeling, testified that it was "absolutely" his understanding that the RFP called for a power sales agreement. He said this was not surprising to him as a manufacturer because he had been dealing with WAPA for over a year and knew that its financial situation left it no other route to take except to purchase power.

None of the eventual proposers, including GEC/Harrison, requested clarification from WAPA as to just what was intended by the RFP. None of the proposals eventually received by WAPA included a sale of power, and other financing mechanisms which were suggested were ruled out by reason of WAPA's limitations on pledging its own credit.

C. *The Proposals Reviewed by WAPA Staff*

Ten companies responded to the RFP. The first step upon receipt of the proposals was a technical staff review of the equipment suggested in each proposal. Little attention was paid to provisions for the design or construction of the facility to house the equipment. The engineering staff's primary interest at this point was to determine if the proposed equipment could be satisfactorily integrated into the existing St. Croix system. A lengthy analysis was prepared and forwarded to the WAPA board containing Director of Engineering Donald Francois' preferred short list of proposers, based largely on his analysis of their equipment submissions.

GEC/Harrison did not make it past Francois' first cut. After two pages of criticism, he noted that

In general all Harrison/GEC proposals lack the experience of a well-established Mechanical and Engineering firm and do not show any proper coordination with well-reputed diesel engine manufacturers . . . .

He was particularly critical of the fact that the engines proposed by GEC/Harrison were unacceptable, because "this model is a new prototype engine with no operational experience." At the trial, it developed that the engine was not even at the prototype stage, but was only being tested in Germany and had not been manufactured for sale anywhere. Because of the criticisms voiced by Francois of the GEC/Harrison equipment submission, he did not proceed to evaluate any other aspect of its proposal nor did he compare it to those of other proposers.

The engines proposed by GEC/Harrision were from M.A.N. in Germany. But his firm, through its American sales office, had submitted several alternate proposals of its own to WAPA for other engines. Models of these M.A.N. engines are in place throughout the world. Two models of the M.A.N. engines offered directly by that manufacturer were on the final list recommended by Francois.

The board decided to have DLJ evaluate, from a financing standpoint, all of the proposals whose equipment submissions had survived the first cut by Francois. And, in deference to the fact that GEC is a local contractor, it included the GEC/Harrison proposal for evaluation. As board member Roy Adams put it in his testimony, "we wanted to give them every chance to carry the fight for as many rounds as they could."

On December 4, 1984, Chairman Richardson forwarded a letter with the technical evaluation to DLJ and invited further technical evaluation "in addition to the financial aspects." But, recognizing the urgency involved, he told DLJ

> Regardless of the approach taken, immediate steps should be initiated to arrive at the agreement most beneficial to the Authority and within a reasonable time frame.

D. *The DLJ Review of Proposals*

DLJ, under the direction of Senior Vice President Charles O. Svenson and Vice President Thomas S. DePre, began the evaluation almost immediately. They decided to meet separately in New York with each of the proposers on the list forwarded by Chairman Richardson. They did not take the GEC/Harrison submission seriously. This was not only because of the devastating Francois critique, but they had received further word from M.A.N. that it had not licensed either GEC or Harrison to quote the engine it was still only testing.

When advised of this complication, Brown of GEC/Harrison could give no assurances except an offer to post a bond. To Svenson and DePre as financial men, however, this uncertainty, with its potential for litigation, would have created an enormous stumbling block to obtaining the $25 million in financing needed for the project. DLJ never invited GEC/Harrison to meet after that, and ended communication with Brown.

Meetings with the other proposers did take place. Each of them was asked if they would participate as principals in a third party financing project involving the sale of power to WAPA. Each of them declined, indicating a desire to furnish the engines needed to

generate the power and steam, and be done with it. No long term relationship was acceptable to any of them.

DLJ, with technical advice from Sunlaw Energy Corporation, did settle on one of the engine models proposed by M.A.N. which was high up on the list from Francois. DLJ always understood that in putting together any financing scheme, WAPA would have the last word on the primary equipment. This explains why DLJ did not go outside of the recommended list forwarded by Richardson, but accepted WAPA's view in that regard.

The auxiliary equipment which goes with the primary engines to generate the power and steam was another matter. This equipment had been included in proposals submitted by the various manufacturers and contractors. The finalists interviewed by DLJ and Sunlaw were happy to negotiate any necessary or desired changes.[4] WAPA was not concerned with this arrangement so long as the primary engines of its choice formed the core of the facility. The interviews concluded January 30, 1985.

Armed with the necessary data, DLJ reported to the WAPA board in February, first informally, and then in writing.

### E. *DLJ's Third Party Financing Proposal*

In February DLJ advised the WAPA board that it would make a proposal to supply 20 megawatts of electric generating capacity to the WAPA grid on St. Croix, and up to 50,000 pounds of steam per hour for its desalinization plant, using M.A.N. equipment. In a February 25, 1985, letter attaching a proposed letter of intent, DLJ explained:

> We have evaluated the constraints imposed by the Authority's outstanding electric revenue bond resolution, and we have concluded that the only feasible way to carry the project in light of these constraints is through an off-balance sheet transaction in which a third party—a private company—will acquire the equipment, arrange for the construction and permanent financing and supply the electric power and steam to the Authority under a "take if produced" contract. Structuring the transaction in this fashion will be beneficial to the Authority in that it will be "off credit", i.e., it will not impair the Authority's credit for other transactions.

---

[4] Brown agreed that it was understood this could be done under an RFP. As he said, under the RFP there were substantial matters to be negotiated and he was not an innocent in such matters.

450

DLJ proposed that a company be formed by themselves and Sunlaw Energy Corporation. Sunlaw's investors include the John Hancock Life Insurance Company, and the securities firms of Merrill Lynch and Smith Barney. The letter introduced Robert Danziger of Sunlaw who would meet with the board in March to describe the proposal in more specific terms and explain the possible savings to WAPA from its acceptance.

In conversations with DLJ officials prior to the receipt of the letter, WAPA board members had learned that a power sale proposal would be forthcoming in which DLJ would form a subsidiary to be the owner of the equipment. Members of the board discussed whether the RFP should be reopened to permit the proposers to offer formal submissions in that regard. Nothing was done, however, except that a letter was sent to DLJ informing them of this possibility.

On March 14, 1985, the formal WAPA board meeting was held and DLJ made its proposal, asking for a non-binding letter of intent which would permit them to commence drafting a contract. Board member Willem Westerbaan was upset at any idea of purchasing power rather than equipment. He contended that "the rules of the game had changed" and that the RFP should be reopened for submissions.[5] Westerbaan testified at trial that he was so incensed that he walked out of the meeting. When pressed at trial to name three firms which might submit third party financing project proposals if the RFP were reopened, he admitted he knew of no such firms other than DLJ. As it subsequently developed, GEC/Harrison had notified the board that it would be interested in making such a submission.[6]

After Westerbaan walked out of the meeting, the discussion continued. The remainder of the board found that while it had not anticipated just how DLJ, as principal, would be involved (through its subsidiary, Caribbean), it did not find this troubling, since it expected DLJ might be paid for its services through equity participation.

A motion to approve the letter of intent was agreed upon by board members Richardson, Adams, Creque and Banks, with Harvey

---

[5] Westerbaan himself had not participated in any of the July and August 1984 meetings leading to issuance of the RFP. He was unable to attend either the formal or informal board or committee sessions. He did not see the RFP until after it was issued.

[6] GEC contacted board members directly, and hand delivered letters urging consideration of its proposals. It made a new proposal for sale of power and steam. Probably because of the low opinion in which WAPA technical staff held GEC, and GEC's lack of experience in third party financing, its entreaties were ignored.

abstaining and Westerbaan absent. The next step was to negotiate the final contract. In doing so, both WAPA and DLJ were faced with important time constraints. For WAPA, there was the urgent need to get the entire project moving before St. Croix suffered the blackout and brownouts predicted. According to the board, the generating situation at its St. Croix plant was fragile in early 1985, with much depending on a temperamental Rolls Royce gas fired turbine engine.

For DLJ, the time constraints were based on different reasons which were no less urgent. The third party financing project was attractive in financial markets because it provided for an investment tax credit and accelerated depreciation program. However, it had been announced that President Reagan would make proposals for sweeping reforms of the federal tax structure, which would eliminate or diminish the tax advantages. He had already received a widely publicized tax reform proposal known as "Treasury I" from the Department of the Treasury. His speech formally embodying his proposals as they would be submitted to Congress, known as "Treasury II", was due to be given on May 28, 1985.

DLJ was fearful that unless an agreement with WAPA was in place *before* the president outlined his proposals, it would not be grandfathered under any subsequent tax reform and the project participants might lose the tax advantages of such a transaction. With the agreement in place, however, DLJ was confident from past practice that the financing package which included the attractive tax credit and depreciation would pass muster, even if the tax law subsequently changed these provisions.

The draft agreement was forwarded to the WAPA board and distributed to management, and the engineering and legal staffs for review. In-house legal counsel to WAPA, Arthur Finch, Esq., forwarded his comments for minor revision to DLJ's counsel.[7] At no time did he suggest that competitive bidding or resubmission of the RFP was legally required. He only took this position in August 1985 after the Governor had removed board members and replaced them with members of his administration, and the Acting Attorney General claimed the contract was invalid in part because of a lack of competitive bidding.

---

[7] Richardson testified that Finch had authority to handle all legal matters as he saw fit, unless countermanded by the executive director or the board. Finch's letter to DLJ's St. Thomas attorney suggested only minor revisions in the contract. Consistent with his silence before the board, it did not mention any possible need for further competitive bidding.

452

During April 1985 and up to May 22, 1985, the draft contract circulated through WAPA and the staff made suggestions for changes. On May 22, 1985, there was a full blown markup session. It was not a formal board meeting, but rather a contract review. Participating were board members, staff, DLJ and Sunlaw. Westerbaan did not attend, and testified he was not notified of the markup session.[8]

The next day, on May 23, 1985, all board members were present for the formal meeting. Also in attendance part of the time were DLJ and Sunlaw representatives. The board discussed some of the matters pertaining to the proposal in executive sessions, with DLJ and Sunlaw personnel excluded. Eventually, a motion was offered and seconded to authorize Chairman Richardson to enter into "a service agreement for the sale of electric power and steam with Caribbean Energy Company, Inc., a wholly owned subsidiary of Donaldson, Lufkin and Jenrette Securities Corporation." Members Adams, Creque, Harvey, Banks and Richardson voted in favor, and Westerbaan voted against. After the meeting, Richarson signed the contract and Creque attested to his signature as board secretary. It was then signed by Svenson on behalf of the DLJ subsidiary, after which Richardson ordered WAPA's executed copies of the contract to be placed under lock and key.

## F. *The Contract—Described and Evaluated*

### 1) *The Contract Described*

WAPA's contract with the DLJ affiliate is without question one of its most significant undertakings since its formation in 1964. It shifts responsibility to provide the base load of power needed on St. Croix from WAPA to the private sector. Here are the highlights of the contract:

a. Caribbean must see to the design, construction, financing, installation and operation of a cogeneration plant to be located on WAPA's property within four years. It will bear all such costs without recourse to WAPA.[9]

---

[8] Engineering Director Francois agreed that more than 80% of his suggested revisions were incorporated in the final document. His suggestion that the actual primary engines be described in the contract was not accepted, on the premise that the contract itself required WAPA's final approval in that respect. The actual equipment package is to be defined in an exhibit to the contract.

[9] During cross examination of Danziger, WAPA's counsel suggested that WAPA's present board, now hostile to DLJ, might drag its feet in implementing the contract, if it is approved by the Court. This is a startling intimation, especially in view of Section 5.7 of the contract, which requires WAPA cooperation. Failure in this respect could subject the individual members of the WAPA board to significant personal liability, a matter not to be taken lightly.

b. The plant must have a capacity of at least 20,000 kilowatts consisting of three eight megawatt units, ancillary equipment and connections to make the plant compatible with the WAPA system.

c. WAPA will purchase not less than 140,000,000 kilowatt hours ("kwh") of electricity and not less than 630,000,000 pounds of steam each year, for twenty years.

d. WAPA will pay 4.5 cents per kwh for electricity and $2.00 per 1,000 pounds of steam; it will also supply fuel and lubricating oil, cooling and makeup water as needed. These prices may increase or decrease according to a formula as time goes on, but will never be lower than those stated above.

e. WAPA will have an option to purchase the plant after twenty years at fair market value, and will also have the right of first refusal to purchase, in the event a sale is contemplated by Caribbean before the end of twenty years.

f. WAPA will have the right of final approval of the prime mover portion (the engines) of the generators, but Caribbean will have the choice of auxiliary and connecting equipment, and will designate the contractor to design, build and install the plant. WAPA may make recommendations at all times.

g. Caribbean will have the right to terminate the contract if it is unable to put together the financing package within one year.[10]

2) *Criticism and Evaluation*

Critics of the contract attacked it on several grounds. They contended that the 4.5 cents per kwh that WAPA must pay will permit a huge profit to Caribbean, that it does not compare favorable with the price at which WAPA could produce the electricity itself, and that the 140,000,000 kwh per year which WAPA must purchase would leave it in an untenable position of producing the remainder of the load required above that amount. Criticism of the steam purchase aspects was more muted, especially since WAPA negotiated a large reduction in the price from $3.30 per thousand pounds down to $2.00 per thousand.

a. *Price per KWH*

The 4.5 cents kwh price, with the addition of the cost to WAPA for fuel oil, lubricating oil, and water as needed, tells us the total cost

---

[10] We are taking the time to offer an evaluation of the contract because under 30 V.I.C. § 116(a)(4), WAPA must give due consideration to the "quality and adaptability of materials, supplies, equipment or services, and the time of delivery or performance offered." If competitive bidding comes into play, we view this section as generally requiring that the contract have some benefit and use to WAPA.

per kwh to WAPA under the Caribbean contract. To analyze potential savings, this can be compared to the present cost per kwh to WAPA to produce the same electricity. Although there was conflict at the trial on this issue, it is not difficult to sort the matter out. Once that is done, it is very clear that the potential savings to WAPA (and, of course, its customers) from the Caribbean contract are impressive.

WAPA's own figures support this view. In its required filing with the Virgin Islands Public Service Commission in August 1985, WAPA's comptroller calculated its own "production cost" per kwh at that time. That price is 10.67 cents per kwh. The comptroller's report makes clear that distribution, debt service, depreciation and administrative costs are not factored into that amount.

WAPA's director of engineering, Donald Francois, in reporting to the board, estimated the cost for fuel at 4.4 cents per kwh. He also disputed the comptroller's calculations, but admitted the comptroller was in a better position to calculate the production cost than he was.

Using the 4.5 cents that WAPA must pay to Caribbean as the base, and adding the cost of fuel as calculated by WAPA for its own generating equipment on St. Croix, we can see that potentially the total is 8.9 cents per kwh for Caribbean's contract, excluding costs for lubricating oil and water as needed. This can be roughly compared to the 10.67 cents per kwh quoted by the comptroller, leaving a potential savings to WAPA of 1.77 cents per kilowatt hour, less the cost of lubricating oil and water as needed.

But even that would not be an accurate estimate of the potential savings, because it was demonstrated at the trial that the engines to be installed by Caribbean are twice as fuel efficient as the mix of engines presently used by WAPA. That translates into a fifty percent cut in fuel consumption which in turn means, potentially, that the 4.4 cents per kwh cost to WAPA for fuel under the Caribbean contract could drop to as low as 2.2 cents per kilowatt hour. If this is correct, the savings to WAPA by purchasing electricity from Caribbean rather than relying on its own production could be as much as 3.97 cents per kwh. If the general cost of fuel oil increases even greater benefits are realized from Caribbean's equipment over WAPA's.[11]

---

[11] Perhaps our own extension of logic is not warranted, and the savings are overstated as a result. This is not fatal to the argument, since Board Member Creque noted in the May 30, 1985, newspaper article introduced into evidence, that the savings of even one penny per kilowatt hour would be significant.

Sunlaw Energy Corporation estimated that the savings to WAPA over the life of the contract will average more than 15 percent a year, a 20-year total of more than $177 million. If borne out by actual operations, the benefit to WAPA and the ratepayers could be enormous. If WAPA purchases more than the minimum, up to the 160,000,000 kwh the Caribbean plant will be capable of producing, the savings will be even greater.

We accept these figures as more credible than any others. When witnesses came forward on behalf of Caribbean and testified about them, counsel for their opponents skirted any discussion of substance about the subject. For instance, Robert Danziger, president of Sunlaw, had furnished a written estimate of the savings before the contract was executed. This letter was in evidence, and during the trial it was referred to critically. However, when Danziger came to the stand, ready for the challenge, none was forthcoming. He was an impressive witness, as was Sunlaw's chief engineer, Robert James Avera. No one challenged Avera's estimate that the fuel consumption would be cut in half with Caribbean's equipment.

### b. *What is WAPA Left With?*

Avera was challenged on another ground. WAPA staff had testified that with Caribbean producing the base load needed for St. Croix, i.e., 140,000,000 kwh, WAPA itself was left only to generate the electricity needed for peak periods. This would cause a strain on WAPA's equipment, they alleged, because it must be turned on and off daily in tune with the peak demand. The equipment was not meant to be used this way, according to the testimony, and was not the most efficient method of utilization. WAPA's staff said it would result in swift deterioration of the equipment. Obviously, however, such a situation would confront WAPA in any power sales agreement whereby WAPA was purchasing a substantial amount of its needs from elsewhere.

Avera conceded that the equipment would require startup and shutdown on a more frequent basis, and he further conceded that this was not normal. But, he emphasized, the startup and shutdown is easily accomplished if the manufacturer's instructions are followed. In any event, the benefits of the contract far offset the reasons cited on this point.[12]

---

[12] Both the executive director and director of engineering opposed the contract. Executive Director George criticized the contract as adversely affecting the remainder of WAPA's power production. He saw the solution to the St. Croix crisis as simply adding backup to the system. Engineering Director Francois

### c. *Caribbean's Profit*

Evidence was presented suggesting that in putting the deal together, DLJ structured it to produce huge profits to itself and others. We received this evidence because of our policy stated to counsel at the outset, to err on the side of receiving rather than rejecting evidence, which is questioned on grounds of relevance. We also accepted the evidence because it was alleged that DLJ suffered from a conflict of interest in its relationship with WAPA.

But the fact that DLJ may have factored in a substantial profit is neither surprising nor disturbing. How else is it going to market the financing, except to make it more attractive than other investment opportunities?

The question to us is not how much money DLJ will make. Rather, we are concerned with whether the contract is attractive to WAPA, and therefore the consuming public. The Virgin Islands has one of the highest electric power rates under the United States flag. WAPA's per kwh cost is also among the highest. If talent from the private sector can meet WAPA's needs and permit it to cut its costs, the profit to the private sector in accomplishing that result should not, for that reason alone, cause cancellation of the benefits.

### G. *South Shore Presses Its Cause*

As early as November 28, 1984, the South Shore group was in contact with WAPA about meeting WAPA's needs on St. Croix. With the huge Martin Marietta bauxite refining plant on the south shore of St. Croix about to close because of economic conditions, the members of the South Shore group saw a number of opportunities.

The plant has its own power and water production facilities, as well as a deep water port and vast acreage for expansion. South Shore did not intend to succeed to Martin Marietta's business of refining bauxite. Rather, it entered into an option with Martin Marietta to purchase the physical facilities on St. Croix for the development of an industrial park. No transfer of Martin Marietta's good name or contracts for the purchase of bauxite or sale of alumina were involved.

Since the facility had an operating power plant, South Shore offered to sell WAPA electricity. Principals of South Shore met with

---

criticized the cost and the adverse affect on the balance of WAPA's power production. One cannot avoid the recognition, however, that the contract diminished the control of both officials over power production. Rare is the person who willingly presides over the dismantling of his or her own fiefdom.

the Governor at his home on St. Croix in December 1984 to spell out its plans. In early May 1985, South Shore heard of the contemplated contract with DLJ's subsidiary and asked for an opportunity to make a competing proposal. But WAPA went ahead with its contract with Caribbean, at the same time asking DLJ to look into the South Shore possibility. Chairman Richardson was of the opinion that South Shore might be able to assist WAPA in providing power during the interim period until DLJ's subsidiary had its plant in place and operating.

By late May 1985, South Shore obtained a copy of the draft agreement DLJ had submitted to WAPA. Ann Abramson testified that a copy of the draft agreement "came to me" at lunch at a mid-island restaurant. She is usually an articulate, assertive and outspoken person, but as she described the incident, Mrs. Abramson was halting, hesitant and nervous. She claimed that the draft was on the very table where she sat down. She "inadvertently" left with it and turned it over to South Shore's attorneys. There can be no doubt South Shore took advantage of DLJ's draftmanship and knowledge of the business. One need only look to South Shore's own agreement later signed by the Governor. Thirty-nine percent (39%) of that agreement is lifted word-for-word from the DLJ draft.

Meetings were held between DLJ and South Shore, but were inconclusive. Word of the Caribbean/WAPA agreement was widespread since on May 30, 1985, a lengthy newspaper article appeared concerning its terms. South Shore took its case to the Governor, and met with him at both office and home. Two of South Shore's principals, Ashley Andrews and Lloyd Williams, are highly experienced at guiding business proposals through high level government circles.

Andrews is a native Virgin Islander and attorney, though he is not licensed to practice in the territory. He was successful at an earlier time in guiding $100 million in construction projects through Government House and the Legislature in record time, without any need for competitive bidding, formal or informal. He did this on behalf of a West German contractor, who is to build all of the projects agreed upon.

Williams, from St. Thomas, served in the Virgin Islands Legislature for many years, rising to majority leader. He is close to the Governor, and experienced at assisting business in making contact with high level government officials. The talents of Andrews and Williams were swiftly put to work.

Obviously at their behest, and that of their colleagues, the Governor entered the fray. He called meetings with the WAPA board and others. He sought information about the status of any arrangement with DLJ, even though the same information had been in the newspaper. But in meetings between the Governor and the WAPA board, Richardson was not forthcoming. He and Adams dissembled, and left the impression there was much to do before any firm agreement could be reached. It is obvious to the Court why they did this. The WAPA board under their intellectual and tactical leadership had given the better part of fifteen months to solving the power needs of St. Croix. They were proud of what was achieved and feared it could quickly unravel. Both Richardson and Adams, wise to the ways of territorial politics, were making every effort to insulate the contract from the pitfalls of political practicalities.

The Governor, finally informed that there was no way WAPA could accommodate both the Caribbean contract and any South Shore proposal, took a series of steps which brought matters to a head. He removed Richardson and Adams from the WAPA board. He also removed private members Creque and Banks, on the theory that their terms had expired and they had no right to continue in office. He replaced Richardson and Adams with Budget Director Stephanos O'Reilly, Acting Attorney General Victor Schneider, and Commissioner of Public Works Cecil George.

His new appointees immediately took the position that the contract between Caribbean and WAPA was void, since it was authorized and executed on May 23, 1985, when there was no quorum of the WAPA board present, Creque and Banks having no right to participate. O'Reilly was elected chairman and the board was immediately presented with a contract from South Shore for the purchase of electricity and steam in quantities even greater than that provided for in the May 23, 1985, agreement. Before it had even been presented to the WAPA board for approval, it had been executed by the Governor, apparently without any analysis or scrutiny by either WAPA technical staff or the new board itself. O'Reilly was authorized to execute the South Shore agreement, thereby committing WAPA to yet another large scale purchase of electricity. He wisely deferred signing it, announcing his intention to have it reviewed by WAPA staff and further discussed by the board.

It is the position of both the Governor and South Shore that their contract could be entered into without soliciting competitive bids. This position is based on South Shore's claim that it is the successor in interest to and the assignee "of substantially all of the business" of

459

Harvey Alumina Virgin Islands, Inc. In 1962, to encourage Harvey to come to the Virgin Islands and build a facility for refining bauxite into alumina, the Government of the Virgin Islands committed itself to a broad-based agreement which gave Harvey substantial inducements. Harvey sold its plant in the early 1970's to a subsidiary of Martin Marietta Corporation, which continued the bauxite refining business until mid-1985.

The agreement between Harvey and the Government provides that the Governor may purchase power and water from Harvey without competitive bidding, on such terms and conditions as only he deems advisable. It is specifically binding "upon the successors in interest and assigns of the Government and of substantially all of the business of Harvey . . . ." 1962 Virgin Islands Session Laws, Act No. 31, p. 16. South Shore asserts that since it is the successor in interest to Harvey by a route traced through Martin Marietta, the Governor can deal with it on the basis described above. The governor agreeing, executed the agreement and submitted it to WAPA for further approval.

At this point, with one contract signed by WAPA on May 23, 1985, now repudiated by its new board, and another signed by the Governor and being pressed upon the board, matters moved to the District Court for resolution.

## III. PROCEDURAL CHRONOLOGY AND ISSUES

A. *Procedural Chronology*

The events described above spawned three separate lawsuits. Not necessarily in the order of filing, they are:

1. An action by Creque and Banks seeking reinstatement to the WAPA board, brought against the Governor and various members of his administration and the WAPA board. Creque and Banks v. Hon. Juan Luis, 21 V.I. 423 (D.V.I. 1985). We consolidated this matter with the two cases described below, and held a hearing advanced, as to this claim, for a trial on the merits. Creque and Banks were ordered reinstated to their seats on the board, and certain actions taken in their absence were declared without legal affect. On September 9, 1985, Governor Luis and Acting Attorney General Victor Schneider appealed the Court's holding to the U.S. Court of Appeals for the Third Circuit, where it is now pending.

2. An action by GEC against WAPA seeking a preliminary and permanent injunction against implementation of the WAPA/Carib-

bean May 23, 1985, agreement as violative of the competitive bidding requirements. WAPA filed an answer contesting the GEC assertion which, by implication at the very least, was an endorsement of the May 23rd agreement. Caribbean moved to intervene in this action, and its motion was granted.

3. An action by Caribbean against WAPA, certain board members, Ashley Andrews of South Shore, and South Shore itself. All parties named as defendants entered answers. WAPA's answer was completely inconsistent with its answer in the GEC action, since it now takes the conflicting view that the Caribbean contract with WAPA was illegal for, among other reasons, violation of the competitive bidding statutes. This explains the prompt intervention by Caribbean in the GEC action to protect its own interest.

All three actions were consolidated. At the hearing on the final merits as to the status of Creque and Banks, we also heard the requests for a preliminary injunction filed by GEC against WAPA and Caribbean against all of the defendants named by it. As stated earlier, we granted a final injunction which reinstated Banks and Creque. The preliminary injunction requests of GEC and Caribbean, however, were denied.

We then, sua sponte, without objection from the remaining parties, bifurcated the issues and scheduled a consolidated trial on three matters: (1) GEC's claim for a permanent injunction against any private negotiations without compliance with WAPA's competitive bidding statute; (2) Caribbean's claim for a permanent injunction against interference with its May 23, 1985, contract with WAPA, and any defenses or assertions against such a claim, and (3) South Shore and any other party's defense against either of the permanent injunction requests.

Trial commenced September 23, 1985, and continued for six trial days. Near the completion of the proceedings the Court dismissed Caribbean's complaint as to all individual board members. Remaining for final action by the Court herein are GEC's claims against WAPA with Caribbean as intervenor, and Caribbean's claims against WAPA, South Shore and Ashley Andrews.

In sum, then, we deal at this stage with the following contentions:

(1) Caribbean seeks a determination that its contract with WAPA is valid, and requests a permanent injunction preventing any interference with its contract rights;

(2) GEC seeks a permanent injunction against WAPA to prevent it from awarding any contract for the sale of power and steam without competitive bidding, and the further determination that the

Caribbean/WAPA contract is invalid for the lack of competitive bidding;

(3) WAPA (by its present board) seeks to have the contract with Caribbean voided because of its own failure to comply with the competitive bidding statute. It also would hold any agreement with South Shore to the same requirement;

(4) South Shore seeks to have the Caribbean/WAPA contract voided for the lack of competitive bidding, but contends that its own contract with the Governor may also be executed by WAPA without competitive bidding by reason of its role as successor in interest to the rights of Harvey Alumina Virgin Islands, Inc., and,

(5) all of Caribbean's adversaries claim a further ground for voiding the contract, asserting that DLJ was engaged in a conflict of interest in its dealings with WAPA.

## B. *GEC's Standing*

■ ■ GEC's standing to bring this action has been challenged by Caribbean from the outset. GEC alleges it has standing as both a disappointed bidder and a ratepayer, to which Caribbean replies that GEC is not a bidder and has no standing as a ratepayer. Standing is a prelude to challenging the action of a government agency. A "plaintiff must allege an injury in fact and [that] the interest sought to be protected by the plaintiff [is] within the 'zone of interests' protected by the statute upon which the claim is based." St. Croix Taxi Assoc. v. V.I. Port Authority, 17 V.I. 80, 83 (1980). These requirements ensure that a party has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness sharpens the presentation of issues." Baker v. Carr, 369 U.S. 186, 204 (1962). Upon a showing of these factors, standing as a disappointed bidder is generally established. Merriam v. Kunzig, 476 F.2d 1233, 1240–41 (3d Cir. 1973); St. Croix Taxi Association, supra.

■ GEC, however, faces an additional obstacle because it is part of a joint venture with respect to the subject matter of this litigation. Pursuant to the law of joint ventures, GEC lacks the capacity to bring this action in its own name. Joint venturers are necessary parties and as such, they must join in an action alleging injury to their common interest or property. Bernitt v. Smith-Powers Logging Co., 189 F. 139, 143 (D. Or. 1911); Kemp v. Murray, 680 P.2d 758, 759 (Utah 1984); Scott Company of California v. Enco Construction Company, 264 So. 2d 409, 411 (Miss. 1972); Waterfront Developers v. City of Miami Beach, 467 So. 2d 733, 734 (Fla. Dist. Ct. App. 1985).

Moreover, Fed. R. Civ. P. 19(b) advises that the failure to join an indispensable party may result in dismissal of the action. Whether Harrison is indispensable is an issue we need not address, because we find that GEC has standing as a ratepayer.

■ Undisputedly, GEC's claim is within the zone of interest which 30 V.I.C. § 116 is intended to protect: the central policy underlying the statute is to prevent fraud and collusion in the administration of public business. This sums up GEC's contention precisely.

A much weaker argument supports the second prong of the standing test. GEC alleges that the cost of the Caribbean/WAPA contract is exorbitant and that in itself constitutes the requisite injury in fact. It relies on Virgin Islands Hotel Association v. Virgin Islands Water & Power Authority, 465 F.2d 1272 (3d Cir. 1972) for this proposition. In that case, the Third Circuit found that an association of hotel owners had standing to contest a rate hike because it was clear that an increased charge for electricity would cause an immediate economic injury. Id. at 1275. We find Hotel Associate inapposite. GEC has not alleged a direct injury. Nor has it shown that such an injury is certain to happen.

The New Jersey Supreme Court faced a similar challenge in Autotote Ltd. v. New Jersey Sports and Exposition Authority, 427 A.2d 55 (N.J. 1981), where the plaintiff was seemingly estopped from attacking a public contract because it had previously been awarded the contract without having bid on it. The public interests at stake prompted the court to relax standing requirements.

> We are concerned . . . with a statutory provision as to which there has been a paucity of judicial attention. The issue is one of substantial public importance and large sums of public monies are at stake. The substantive issue before the Court has been fully developed by both parties and there is a strong likelihood that it would be raised again in the near future if we were to decline to reach it. Since the question is ripe for judicial resolution and since a decision on the public bidding issue will serve the public interest, we address the merits of plaintiff's argument.

Id. at 58.

■ The contract contested here presents compelling interests. It will determine the adequacy of St. Croix's electricity supply through the year 2005 as well as the rates that island residents will pay for

this essential service. Consequently, we proceed to decide this case with GEC as a party.

## IV. COMPETITIVE BIDDING AND THE WAPA CONTRACT

### A. *Bidding Generally*

■ Competitive bidding laws originated in distrust of public officers whose duty it was to execute public contracts. Webster v. Belote, 138 So. 721, 724 (Fla. 1931); 64 Am. Jur. 2d Public Works and Contracts § 37. The laws are designed to prevent fraud, collusion, favoritism and improvidence in the administration of public business. E.g., Autotote Ltd. v. New Jersey Sports and Exposition Authority, supra at 58; Waste Management, Inc. v. Wisconsin Solid Waste Recycling Authority, 267 N.W.2d 659, 663 (Wis. 1978); Platt Electric Supply, Inc. v. City of Seattle, Division of Purchasing, 555 P.2d 421, 426 (Wash. App. 1976); 64 Am. Jur. 2d Public Works and Contracts § 37; 81 A.L.R.3d Bidding on Public Utility Contracts § 2.

■ ■ As a general rule, competitive bidding is a mandatory requirement, e.g., Graydon v. Pasadena Redevelopment Agency, 164 Cal. Rptr. 56, 58 (Cal. Ct. App. 1980), and contracts executed in violation of statutory bidding requirements are void. Platt, supra at 431. "Public officials have no discretion to ignore the requirement of open competitive bidding, no amount of regard for their intention to act for the public good can provide an excuse for a violation of law and the question here is not one of good faith but of power to disregard the law." American Totalisator Co., Inc. v. Seligman, 384 A.2d 242, 263 (Pa. Commw. Ct. 1977).

■ The open competition fostered by competitive bidding serves two recognized purposes. First and primarily, it protects the taxpayer or ratepayer by assuring efficient use of public revenues. Competitive bidding also serves to provide a fair forum for those interested in undertaking public projects. Platt, supra at 426.

■ 30 V.I.C. § 116(a) (Supp. 1984) mandates that WAPA conform to the general rule. It provides in pertinent part:

§ 116(a) *Competitive bidding*

All purchases and contracts for supplies for services except for personal services, made by the Authority, including contracts for the construction of facilities of the Authority, shall be made after advertisement for bids sufficiently in advance of opening bids for the Authority to secure appropriate notice and opportunity for competition; Provided, That where the expense

464

estimated to be necessary in connection with the purchase or work does not exceed two thousand five hundred (2,500) dollars the same may be carried out without advertisement for bids.

Consequently, certain acts are clearly prohibited. Private negotiations with bidders regarding price or technical alterations violate the statute. E.g., American Totalisator v. Seligman, supra. In the absence of statutory authority, a contract subject to bidding may not be summarily renewed. Browning-Ferris Industries of Tennessee, Inc. v. City of Oak Ridge, 644 S.W.2d 400 (Tenn. Ct. App. 1983). And contracts whose subject matter falls within the statute may not be awarded without compliance with bid procedures. Platt, supra.

■ While mandatory when applicable, competitive bidding statutes are not absolute and generally provide for certain exceptions. In these situations the government unit has discretion to bypass bidding and directly negotiate a contract. 30 V.I.C. § 116(a) (Supp. 1984) exempts bids when:

(1) an emergancy requires immediate delivery of the materials, supplies, equipment, or performance of the services; or

(2) repair parts, accessories, or supplemental equipment or services are required for supplies or service previously furnished or contracted for; or

(3) professional, financial (including financial printing) or other expert services or work are required and the Authority shall deem it best in the interest of good administration that contracts therefor be made without such advertisement; or

(4) prices are noncompetitive because there is only one source of supply or because regulated under law; in such case the purchase of such materials, supplies, or equipment, or procurement of such services, may be made in the open market in the manner usual in commercial practice. In the comparison of bids and the making of awards, due consideration shall be given to such factors (in addition to whether the bidder has complied with the specifications) as the bidder's ability to perform construction work of the kind involved in the construction contract under consideration; the relative quality and adaptability of materials, supplies, equipment, or services; and the time of delivery or performance offered. The Authority may prescribe rules and regulations for the submission of bids.

Courts have followed two approaches in determining the flexibility with which the exceptions are to be read. One view is that bid-

ding exceptions should be construed to advance the public interest and the policies underlying the statutes. 64 Am. Jur. Public Works and Contracts § 37 (bid laws "should be construed with the primary purpose of best advancing the public interest, and they must generally be strictly construed with the words used therein not extended beyond their plain meaning, but a strict construction of such a statute is not always required"); Graydon, supra at 59 (competitive bid requirements to be "construed fairly and reasonably with sole reference to the public interest and in light of the purposes to be accomplished").

In Waste Management, Inc. v. Wisconsin Solid Waste Recycling Authority, 267 N.W.2d 659 (Wisc. 1978), the Wisconsin Supreme Court noted that the efficient transaction of government business mandates a flexible interpretation of the bidding statutes.

> Statutory bidding provisions must be read in light of the reason for their enactment, lest they be applied where they were not intended to operate and thus deny the authorities the ability to deal with problems in a sensible, practical way.

Id. at 663–64.

On the other hand, some courts have found that bid statutes should be strictly construed against the government because of the anti-fraud rationale. Autotote, Ltd., supra at 58 (". . . it is axiomatic that statutory exceptions to public bidding requirements should be strictly construed so as not to dilute this policy or permit a public body to avoid pertinent legislative enactments"); Browning-Ferris, supra at 403 (bidding requirements are "strictly construed against the governing authority"); City of Miami Beach v. Klinger, 179 So. 2d 864, 866 (Fla. Dist. Ct. App. 1965) (bid requirements are "of highly remedial character and should receive a construction always which will fully effectuate and advance their true intent and purpose and which will avoid the likelihood of same being circumvented, evaded or defeated").

■ An important issue in enforcing the Caribbean/WAPA contract is whether the exemption for financial or other professional services should be read to include all aspects of the package DLJ will offer to investors. The Waste Management approach offers the greatest flexibility in interpreting 30 V.I.C. § 116(a)(3) to encompass both the equipment and construction portions of the project, portions which otherwise would be subject to competitive bidding. We adhere to this view and adopt it.

■ Allowance for flexibility can be seen in the language of the statute under which WAPA operates. 30 V.I.C. § 116 has broad enough scope to allow WAPA to take a variety of approaches. It does not require that a bid be awarded to the lowest bidder. It does not tell WAPA precisely how it must act in meeting bidding requirements. Section 116(a)(4) employes language which effectively places a burden on WAPA's board to act in good faith, with the best interest of the ratepayers in mind. It does not prevent WAPA from receiving proposals and then refining them, reworking them, renegotiating them, or altering them, so long as the public interest is foremost in its mind.

B. *Professional Service Exception*

■ 30 V.I.C. § 116(a)(3) exempts from bidding "professional, financial . . . or other expert services or work." This personal service exception is recognized in most jurisdictions and has been applied to technical and professional services (doctors, and lawyers), as well as to contracts calling for skill, special training or discretion (architects and engineers; accountants and auditors; construction superintendents and supervisors; real estate appraisers and brokers; insurance brokers and financial advisors). See 15 A.L.R.3d Public Contracts—Personal Services §§ 2–13; 64 Am. Jur. 2d Public Works and Contracts § 43. "A general test to be applied in determining whether a contract is exempt from bidding requirements is whether the nature of the work called for makes it impossible or impractical to draw specifications satisfactorily to permit competitive bidding." Aqua-Tech, Inc. v. Como Lake Protection and Rehabilitation District, 239 N.W.2d 25, 28 (Wisc. 1976).

One rationale offered for the expanded reading traditionally given to this exception is that the "legislature must have intended to leave public bodies free to judge the professional qualifications of those who perform services requiring scientific knowledge and professional skill." Waste Management, supra at 665; Aqua-Tech, supra at 28.

■ It is clear that a government contract calling solely for a skilled or professional service is exempt from bidding requirements. In this respect, numerous components of the Caribbean/WAPA contract are exempt (e.g., design, procurement of insurance and financing). The result is less clear, however, when the contract calls for both exempt services and non-exempt equipment.

In Autotote, Ltd., supra, the New Jersey Supreme Court held that a contract calling for the installation and maintenance of a totalisa-

467

tor system at the Meadowlands Racetrack fell within the professional service exemption of the appropriate New Jersey statute in part because of "the inextricable integration of a sophisticated computer system and services of such a technical and scientific nature . . . ." Autotote, Ltd., supra at 59. The New Jersey plaintiff had formerly supplied the track's computers on the basis of a successful response to an RFP but was replaced at the expiration of its three-year contract when it could not compete with the opposition's state of the art equipment. The plaintiff then sought to enjoin performance of the contract because the sports authority had not complied with the bidding statute.

In upholding the contract, the court distinguished the situation where services are limited to standby personnel, noting that the highly sophisticated equipment required specially trained workers for the operation and maintenance of the system. Autotote, Ltd., supra at 59. Moreover, the court placed special emphasis on the fact that the computer was part of a rapidly developing field. Id. at 60.

The Wisconsin Supreme Court reached a similar result in Waste Management, supra. Here, the state authority had executed a contract for the design, construction and operation of a recycling facility after negotiations with priority proposers who were selected from their responses to an RFP. The plaintiff, a disappointed proposer, argued that the contract should be characterized as one for the purchase of equipment and for construction (and thus subject to competitive bidding) because these were the primary cost items of the deal. Waste Management, supra at 663.

In upholding the contract, the court made several points which parallel the Caribbean/WAPA project, namely:

—the components of a recycling system are "so interrelated that the ultimate nature of the system must result from professional expertise and educated judgment . . . ." Id. at 664.

—"the Authority wanted to be able to hold one entity accountable for the successful operation" of the facility. Id.

—it was unimportant that the successful bidder contracted out the design of the facility because "[s]o long as the contract encompasses 'scientific knowledge and professional skill,' the services may be made available through the original source or through a 'broker'". Id. at 665.

In adopting this view, the court implied that bidding statutes were to be read "reasonably" to give governments flexibility in problem solving. Id. at 663–64.

468

What is noteworthy about the New Jersey court's view in this respect is that, in applying a strict construction approach to the bidding statute, it still arrived at the same result as the more flexible Wisconsin court in Waste Management. In each instance, as well as in the WAPA plan, the crux of the project package was professional services. A contract that integrates a core of financial services with a provision for highly technical equipment was held exempt from bidding under the bidding statutes. From its strict constructionalist view, the New Jersey court pronounced:

> If the law is to keep pace with scientific developments in business and commerce, it must adapt statutory provisions, such as the one in question, to the realities of the day.

Autotote, supra, at 59.
It then cited Waste Management, with approval.

This is precisely our own position. We believe that the WAPA board, in charting new territory for itself in meeting the power needs of St. Croix, used its own flexible approach to this urgent problem. We say flexible, because WAPA did seek proposals for supplying the "primary mover" (engine) portion of the equipment. It then insisted in its contract with DLJ's subsidiary that the equipment of one of the favored engine suppliers who had responded to the RFP (M.A.N. of Germany) be used in the project. It is the cost of this equipment which consumes the bulk of the estimated $25 million investment. Thus, it can be said, that WAPA used a flexible approach in obtaining the basic equipment it needed after soliciting a variety of proposals. It then turned to DLJ to complete the package. After all, to WAPA the most important part of the arrangement was to select prime generating equipment compatible with its own system and capable of meeting the needs of St. Croix power consumers. It might even eventually own this equipment. Accordingly, even though we find that WAPA was not required to comply with the competitive bidding statute because the contract was covered under the professional services exception to 30 V.I.C. § 116, we cannot help but note that WAPA made every good faith effort to seek a broad response to its needs by seeking proposals. That no proposer made an offer to sell power and steam simply forced WAPA to turn more anxiously to DLJ for a solution.

Datatrol, Inc. v. State Purchasing Agent, 400 N.E.2d 1218 (Mass. 1980) is the most similar case in which a services/equipment contract was enjoined in its entirety for failing to comply with bidding requirements. Involved here was the purchase of a computer system

for use in the state's lottery along with operation and maintenance services. The court held that the applicability of the bidding statute[13] was determined by the RFP and not the particulars of the disputed contract. "If it appears from the RFP that the contract eventually executed might be covered by the statute, the statutory requirements control." Id. at 1227. The court also held, without discussion of the nature and quality of the services involved, that the services were "incidental" to the purchase of equipment. Id.

That Datatrol, Inc., presents a highly, even unrealistically, restrictive application of a bidding statute, is demonstrated by a finding that the use of a problem-solving RFP (where proposers are invited to create their own specifications to meet the government's stated goal) was contrary to the bidding laws. The court reasoned that competitors cannot compete fairly without unambiguous specifications. Id. at 1230–31.

This reasoning is inexplicable. It is too rigid and doctrinaire in light of the language of both Autotote, Ltd. and Waste Management. We find it out of touch with the swiftly developing world of technology and finance as the 20th Century draws to a close with a burst of innovation and unceasing change.

By contrast, Autotote, Ltd. and Waste Management offer a pragmatic framework within which to analyze complex contracts. The Caribbean/WAPA contract should be enforced because the character of the disputed agreement is determined by the relative importance of the services to the overall success of the project. Waste Management used this approach and found that it was not dispositive that the equipment constituted the largest percentage of the contract price. Rather, the court characterized the contract as one primarily for services because the project would be doomed without the requisite expertise. Similarly in Autotote, Ltd., the New Jersey court focused on the skill needed to operate and maintain the equipment rather than on the purchase of the equipment itself.

This distinction is the key to our upholding of the Caribbean/WAPA contract. On May 23, 1985, WAPA contracted for DLJ's ability to finance a cogeneration plant. In order to sell the package to investors, DLJ had to have reputable contractors committed to the project. Thus, each sub-contract, whether for construction or ancillary equipment, was a crucial component of the main finance contract which is undisputedly exempt from competitive bidding.

[13] The Massachusetts statute contained no professional service exception. Such an exception appears to exist by negative implication.

470

That is why the contention of GEC, that the contract is a mere sale of power and steam, is simplistic and wrong. As Richardson stated the May 23, 1985, contract was exempt from competitive bidding because it was primarily a financial services contract. True, he admitted that the end result was the sale of power, however, Richardson asserted that the sale of power was inexorably integrated to the overwhelming financial necessities—that WAPA was unable to acquire power without resort to third-party off balance sheet financing. Robert Danziger called the contract for the sale of power the "cornerstone" for what was actually a financing mechanism. It generated the revenue stream to support the equipment financing. In reality, according to Danziger, the contract involves law, economics, systems analysis, compatible models, environmental expertise, project management and most of all, enormous risks to the entrepreneur who finances the entire package.

Also significant is the uniqueness of DLJ's third-party financing plan, which is similar to the emerging computer technology at issue in Autotote, Ltd. As noted in DLJ's trial brief, its plan is unique because repayment will utimately depend on the operational profits of the facility without WAPA's credit being pledged. Caribbean Energy Corp. Trial Brief at 16. This point was not disputed by the other parties.

 We adopt Autotote, Ltd.'s hands off approach and defer to the opinion of financing experts. Some day third-party financing arrangements may well "develop to such a degree of standardization and reliability that the services provided will become routine." Autotote, Ltd., supra at 60. In this event, a contract such as Caribbean's may well be subject to competitive bidding requirements. We hold today, however, that the expertise involved brings this contract squarely within the professional service exception.

We expressly reject the analysis of Datatrol, Inc., for the following reasons. First, the Massachusetts statute did not specifically provide for the professional service exception. Moreover, the court's finding that the professional service provisions were incidental to the equipment purchase is of dubious merit since the analysis fails to address the role of the services in performance of the contract, an element which is of the utmost importance in determining the true nature of the Caribbean/WAPA contract.

In sum, Richardson told the board that at its heart, the contract was a financial services agreement, and exempt from competitive

471

bidding.[14] We believe he might have viewed the professional services exception contained at 30 V.I.C. § 116(a)(3) in even broader terms. As quoted earlier, it permits a competitive bidding exception for instances where

> professional, financial (including financial printing) *or other expert services or work are required* and the Authority shall deem it best in the interest of good administration that contracts therefor be made without such advertisement;

Id. (Emphasis added.)

At the trial there was not a scintilla of evidence that WAPA board members, in the events leading up to the execution of the May 23, 1985, contract, were acting out of self interest or self aggrandizement. Director of Planning Roy Adams is considered a pillar of integrity in the territorial government, and he, along with Richardson, risked their careers in approving this contract and attempting to spare it from attack and dismemberment. This six day trial demonstrated without a doubt that in approving this contract the WAPA board met the mandate of § 116(a)(4) that such a course of action be "in the best interest of good administration . . . ."

### C. *Emergency Exception*

Government expenditures are exempted from competitive bidding when made for "an emergency requir[ing] immediate delivery of the materials, supplies, equipment, or performance of the services." 30 V.I.C. § 116(a)(1).

 As noted, the general rule of statutory construction is that statutory language should be accorded its ordinary meaning. Black's Law Dictionary 469 (rev. 5th ed. 1979) defines "emergency" as

> A sudden unexpected happening; an unforeseen occurrence or condition; perplexing contingency or complication of circumstances; a sudden or unexpected occasion for action; exigency; pressing necessity. Emergency is an unforeseen combination of circumstances that calls for immediate action.

 In view of the fact that the WAPA board was cognizant of the need for a new generating facility since 1984 it cannot fairly be said that the May 23 contract was prompted by an unforeseen com-

---

[14] Since he was Commissioner of Property and Procurement, he was responsible for many millions of dollars of equipment and service contracts yearly. Most of the other members of the board deferred to his expertise.

bination of circumstances. Thus, the emergency exception does not apply in this case.

Case law supports this view. In American Smelting & Refining Co. v. United States, 259 U.S. 75 (1921), the Supreme Court held that World War I created an emergency which exempted a contract for the purchase of copper from federal competitive bidding requirements. Id. at 78. "There can be no question that the war created a public exigency, and that it would be going far to deny the contract was for a delivery as immediate as was practicable for the subject-matter." Id.

A public emergency which justified a departure from local bidding laws was also found when a waterline burst, shutting off a community's water supply. Martin Excavating, Inc. v. Tyrollean Terrace Water and Sanitation District, 671 P.2d 1329, 1330–31 (Cal. Ct. App. 1983).

By comparison, a contract for street repair executed in September was subject to bidding laws where the damage had resulted from spring rains. Tobin v. Town Council of Town of City of Sundance, 17 P.2d 666 (Wyo. 1933). "By definition, the term 'emergency' implies a sudden or unexpected necessity requiring speedy action." Id. at 672. See 64 Am. Jur. 2d Public Works and Contracts § 39. See also Browning-Ferris, Inc. v. City of Leon Valley, 590 S.W.2d 729, 733 (Tex. Ct. App. 1979).

D. *Sole Source Exception*

■ Finally, competitive bidding is not required when there exists only one source of supply because the lack of competition would obviously make the government's effort futile. 30 V.I.C. § 116(a)(4). The sole source exception has never, to our knowledge, been put into issue. A similar provision, however, exists in the regulations promulgated under the territory's general procurement statute.

■ Like WAPA, the Virgin Islands Government must generally solicit competitive bids in connection with the conduct of public business. 31 V.I.C. § 235. 31 V.I.R. & Regs. § 239 dispenses with the bidding requirement in certain circumstances where the procedure would be futile, such as when "[t]he property or services can be obtained from only one person or firm (sole source of supply)." 31 V.I.R. & Regs. § 239–12(a)(1).

The Third Circuit has held that "sole source" is not necessarily synonymous with an absolute monopoly. The exception applies where only one of two potential suppliers can fairly be considered

reliable. Inter-Island Transport Line, Inc. v. Government of the Virgin Islands, 539 F.2d 322, 326–27 (3d Cir. 1976).

Caribbean argues that this interpretation of the government's procurement powers should be implied to WAPA, noting in support the parallel language in the two provisions. Caribbean concludes that in light of its prior success in arranging similar deals for other utilities, it is the sole reliable source among the parties contesting its contract with WAPA. Thus, the contract is exempt from competitive bidding.

Even if we apply the Inter-Island interpretation to the specific statute governing WAPA, a finding that Caribbean is a sole source would be unfounded.

■■ DLJ executive Charles O. Svenson testified that his firm is one of few investment houses involved in off-book financing of utilities. Moreover, DLJ has participated in only half of the ten such projects completed thus far. This statistic is important indicia of DLJ's ability and therefore Caribbean's to fulfill its contract with WAPA. We find it conclusively demonstrates that DLJ is neither the sole source or single reliable source of a third-party financing deal. Inter-Island should not be read so narrowly as to restrict the pool of competitors to those whose proposals have been sought. Thus, the single source is inapplicable here.

## V. OTHER SUBSTANTIVE CONTENTIONS

A. *South Shore's Claim of Preference*

When the government entered into the 1962 contract with Harvey Alumina Virgin Islands, Inc. ("Harvey"), its purpose was to create jobs for Virgin Islanders. Harvey built and operated a facility which refined bauxite into alumina. By late 1984, more than 500 persons were employed at the facility on St. Croix's south shore.

The South Shore group has no intention of refining bauxite, the principal business of both Harvey and its successor, Martin Marietta. The option granted South Shore by Martin Marietta simply permits South Shore to purchase the land and everything on it at a certain price. South Shore is neither entitled to take over Martin Marietta's contracts for the purchase of bauxite nor for the sale of the refined alumina. In fact, Martin Marietta did not shut its doors until all of the bauxite on site had been refined and the resulting product moved elsewhere.

■■ Thus it cannot be said that South Shore is the successor in interest and assignee of "substantially all of the business" of Harvey

and/or Martin Marietta as the Harvey contract requires. Clearly, the framers of the contract deliberately spoke in terms of "business" rather than "assets" on the premise that it is the "business" which produces the jobs.

Therefore, since Harvey and Martin Marietta may have been able to sell electricity to the government without the need to solicit competitive bids, this opportunity does not pass to South Shore on the basis of its option from Martin Marietta. South Shore itself claims this as the only basis whereby competitive bidding could be avoided with respect to its contract.

We have held that the WAPA contract with Caribbean was not subject to competitive bidding because of the professional services exception. Since all parties agree that there cannot be two contracts for the purchase of power and water by a third party financing mechanism, we need not reach the question of whether South Shore's contract would also be protected by the same exception.

South Shore itself does not make such a claim. Since the WAPA/Caribbean contract is legal and binding, and we are permanently restraining South Shore, among others, from interference with that contract, any further discussion of the South Shore contract is moot.

B. *DLJ's Conflict of Interest*

 Finally, both South Shore and WAPA also argue that the Caribbean agreement is void since DLJ violated the Virgin Islands conflict of interest statute. This statute prohibits territorial officers and employees from having any financial interest in any contract negotiated by them in their official capacity or by any public agency of which they are a member. 3 V.I.C. § 1102(1) and (3). The definition of territorial employee includes "consultants of any branch of the Government or public agency employed on a contract or fee basis." 3 V.I.C. § 1101(8). We agree that DLJ fits within this definition. For the following reasons, however, we find no violation of the act.

First, a person is in violation of the statute if they have

an interest which is in substantial conflict with the proper discharge of his duties in the public interest and of his responsibilities as prescribed in the laws of the Virgin Islands or a personal interest, arising from any situation, within the scope of this chapter, if he will derive a direct monetary gain or suffer a direct monetary loss, as the case may be, by reason of his official activity.

3 V.I.C. § 1103.

■■ ■■ Clearly an actor cannot derive economic gain through the use of his position as a public servant. This is not to say, however, that an organization such as DLJ cannot be compensated for organizing, negotiating and financing the Caribbean project, particularly when it is noted that DLJ was approached by WAPA to be a principal in the project. From the inception of their affiliation, WAPA looked to DLJ to solve the problem the Authority faced in obtaining additional power generating capacity. It is apparent from the testimony that DLJ did exactly what WAPA intended them to do—construct a package using WAPA approved generating equipment combined with appropriate financing not in violation of the bond restrictions. We therefore find DLJ did not violate the Virgin Islands conflict of interest statute.

As we noted earlier, Board Member Creque specifically testified that the board considered that one of the methods by which DLJ would be paid would be by equity participation. That is precisely what occurred. The role to be fulfilled by DLJ was, from the start, as either agent or principal. It never changed, even though the language of subsequent retention letters may have varied from the original.

South Shore cites United States v. Mississippi Valley Generating Company, 364 U.S. 520 (1961) as precedent for the proposition that DLJ violated the Virgin Islands conflicts statute. Mississippi Valley is remarkably similar to the case before us. Wenzell, a Vice-President and Director of First Boston Corporation, undertook to advise the federal government and act on its behalf in negotiations culminating in a contract between the government and the Mississippi Valley Generating Company. This was done at the suggestion of First Boston's chairman and at the request of the Bureau of the Budget. The contract called for the construction and operation of a steam power plant. Before construction, but after Mississippi Valley had taken steps toward performance, the contract was cancelled. Mississippi Valley sued the government in the Court of Claims for the sums it had expended.

The government defended primarily on the grounds that the contract was unenforceable due to an illegal conflict of interest. Specifically, the government contended Wenzell violated the Federal conflict of interest statute because he, as an officer of First Boston, was interested in a contract which he helped negotiate on behalf of the government. The Supreme Court held that Wenzell violated the conflicts statute.

Mississippi Valley has superficial appeal. Upon closer scrutiny, however, one important fact distinguishes that case from ours. There, the government designated First Boston a mere agent. In the case before us, WAPA expressly designated DLJ a principal in the deal. This distinction undermines the authority of Mississippi Valley. DLJ did not abuse its relationship with WAPA because WAPA from the start intended DLJ to provide financing.

██ Even assuming, arguendo, that DLJ had violated the conflict of interest statute, the proper remedy is not invalidating the contract. The penalties for violating the statute are found at 3 V.I.C. § 1108 which states:

> Any person who knowingly violates a provision of this chapter shall be guilty of a public offense and upon conviction thereof shall be punished by imprisonment for not less than one year nor more than five years; or by a fine of not more than $5,000 or a sum equal to any direct monetary gain derived in connection with such violation, whichever is greater; or both such fine and imprisonment.

A conflicts violation, therefore, would not give WAPA or South Shore the remedy they seek, i.e., the total voiding of the contract.

## VI. CONCLUSION

Having upheld the contract between Caribbean and WAPA, we will grant a permanent injunction against other parties herein restraining them from any interference with the rights and obligations created under the contract. The complaint by GEC against WAPA, with Caribbean as intervenor, will be dismissed with prejudice. There are remaining counts of the Caribbean complaint against the remaining defendants in that case which are tort claims seeking money damages, including punitive damages. They were not included in the trial already held. Discovery will continue and the case will be scheduled for trial on those counts in due course.

## JUDGMENT

THIS MATTER is before the Court for entry of judgment. A memorandum opinion of even date herewith contains the Findings of Fact and Conclusions of Law on which the judgment is based. The premises considered, now therefore it is

ORDERED and ADJUDGED:

477

1. THAT the complaint of General Engineering Corp. against Virgin Islands Water and Power Authority is DISMISSED, with prejudice.

2. THAT General Engineering Corp., Virgin Islands Water and Power Authority, South Shore Alumina, Inc., Ashley Andrews, and any persons purporting to act on their behalf, are permanently enjoined from interference with the rights, duties and obligations contained in a certain contract between Caribbean Energy Co., Inc., and the Virgin Islands Water and Power Authority, dated May 23, 1985.