GENERAL ENGINEERING
CORPORATION

v.

VIRGIN ISLANDS WATER AND
POWER AUTHORITY.

CARIBBEAN ENERGY CO., INC.

v.

SOUTH SHORE ALUMINA, INC., Ashley Andrews, Virgin Islands Water and Power Authority, Stephanos O'Reilly, Cecil George, Willem Westerbann, Victor Schneider.

Appeal of VIRGIN ISLANDS WATER AND POWER AUTHORITY.

Martin Marietta Aluminum Properties, Inc., Amicus Curiae.

Nos. 85-3668, 85-3700.

United States Court of Appeals, Third Circuit.

Argued Sept. 16, 1986.

Decided Oct. 27, 1986.

As Amended Nov. 26, 1986.

Rehearing and Rehearing En Banc Denied Feb. 17, 1987.

Samuel H. Hall, Jr. (argued), St. Thomas, U.S. Virgin Islands, for Virgin Islands Water and Power Authority.

Frederick G. Watts, Charlotte Amalie, St. Thomas, U.S. Virgin Islands, Eugene F. Bannigan (argued), John D. Gordan, III, Ethan Greenberg, Lord, Day & Lord, New York City, for Caribbean Energy Co., Inc.

Peter C. Kissel, Gilbert E. Hardy, Gary C. Adler, O'Connor & Hannan, Washington, D.C., Harry L. Smith, Patricia A. Moore, Martin Marietta Corp., Bethesda, Md., amicus curiae.

Before ADAMS, STAPLETON and GARTH, Circuit Judges.

**OPINION OF THE COURT**

ADAMS, Circuit Judge.

In this appeal the Virgin Islands Water and Power Authority (WAPA) seeks to in-validate its power-sale agreement with the Caribbean Energy Corporation (CEC). WAPA asserts that the agreement conflicts with Virgin Islands statutes that prohibit contracts involving a conflict of interest, and that require public contracts to be bid competitively. The District Court of the Virgin Islands found that the agreement was valid, and enjoined WAPA, General Engineering, South Shore Alumina, Ashley Andrews, and persons acting on their be-half from interfering with it. *General Engineering Corp. v. Virgin Islands Water and Power Authority*, 636 F.Supp. 22 (D.V.I.1985).

I.

In early 1983 WAPA, an independent in-strumentality of the Government of the Virgin Islands, consulted Arthur Lowe, an investment banker, regarding the fea-sibility of financing a new electric generat-ing project on St. Croix. The outcome of the discussions was the appointment on December 12, 1983 of Donaldson, Lufkin & Jenrette (DLJ), a large investment banking firm with which Lowe was associated, as "exclusive agent and/or principal for a term of ninety (90) days, for the purpose of arranging financing to suit the needs and specification of the V.I. WAPA."[1] App. 2052. This appointment was renewed for a six-month period in a May 2, 1984 letter from WAPA to DLJ, in which WAPA au-thorized DLJ "to act as its exclusive agent in arranging the financing of certain power generating equipment." App. 2058. The letter employs contractual language: DLJ has an "obligation" to arrange the financ-ing, WAPA "agrees" to cooperate with DLJ, and there is a place at the bottom of the letter for the signatures of each party. By a letter dated October 12, 1984, DLJ's authorization to act as WAPA's "exclusive agent" in arranging financing was extend-ed until February 1, 1985. App. 2085. This letter is far more specific than the two previous letters. It narrows DLJ's task to

1. By a letter dated May 6, 1983, WAPA had issued a similarly worded 90–day appointment to Davis Skaggs & Co., the firm with which Lowe was then affiliated.

evaluation of several proposals by equipment manufacturers tendered in response to a Request for Proposals that WAPA issued in August 1984, and negotiation of a financing arrangement that would suit WAPA's needs. None of this correspondence adverted to any formula by which DLJ would be compensated for its efforts. One of the WAPA board members testified that DLJ's compensation was to be derived from any financing package that DLJ might arrange. App. 332.

WAPA's requirements for increased power production were both pressing and quite difficult to solve. The residents of St. Croix were in urgent need of new electric generating capacity, but WAPA's options were circumscribed by a bond indenture that effectively prevented it from incurring additional debt to finance new facilities. WAPA and DLJ therefore contemplated a third-party non-recourse financing arrangement. Under such a program the new plant would be financed and owned by investors independent of WAPA, and WAPA would purchase the output of the plant and resell it to its customers. The investors' security interest would run only against the new plant, and not against WAPA. This sort of financing is highly complex and relatively new to the financial community. The district court found that only about ten such projects had been successfully completed, 636 F.Supp. at 26, and there was testimony that hundreds of attempts to arrange such financing packages had failed. App. 892.

On January 24, 1984, shortly after its initial appointment by WAPA, DLJ submitted a proposal to construct a plant using generating units manufactured by Wartsila Power, Inc. App. 2503. The proposal stated that upon WAPA's approval of the suggested equipment, DLJ would put together a financing package. There was testimony that the contemplated financing was to be by third-party ownership with the sale of

output to WAPA, as discussed above. App. 333. WAPA, dissatisfied with the equipment choice, rejected the proposal. 636 F.Supp. at 29.

In search of alternative equipment, WAPA in August 1984 issued a Request for Proposals (RFP) for the design and construction of a 20–megawatt electric generating facility. App. 2060. WAPA did not consult with DLJ before issuance of the RFP. The language of the RFP is somewhat ambiguous. A large portion of it describes the technical specifications of the plant and the role of the proposers in designing and constructing the plant. Isolated language in the RFP, however, suggests that the proposer is also responsible for providing financing for the plant. App. 2062. This suggestion is confirmed by a statement appearing later in the document: "Payments to be in accordance with a negotiated agreement based on purchase of power or lease purchase agreement," which indicates that third-party financing was contemplated. App. 2074. On the other hand, the RFP also states: "Title to the work covered by this contract shall pass to the owner upon formal acceptance ...," id., apparently contemplating the outright purchase of the facility by WAPA. The district court found that these inconsistencies resulted from WAPA's lack of familiarity with the complexities of third-party financing. 636 F.Supp. at 29.

WAPA received ten proposals in response to the RFP. Its technical staff pared the list down to six proposals that it believed merited further consideration. On December 4, 1984, WAPA sent a slightly different list of six proposals to DLJ,[2] directing it to evaluate them as provided in the letters appointing DLJ as WAPA's "agent." DLJ completed this task on January 30, 1985, after interviewing representatives of four of the proposers in New York. None of the four proposers was willing to

---

**2.** The list prepared by WAPA's staff included a proposal from Sulzer Bros., Inc., but not the one from General Engineering Corp., which it considered unacceptable on its face. The list WAPA sent to DLJ dropped Sulzer but included Gener-

al Engineering. General Engineering was the only Virgin Islands firm among the proposers, and WAPA wished to give it the benefit of the doubt. 636 F.Supp. at 30.

participate as principal in a third-party financing arrangement.

At about this time dissension developed within the WAPA board. At a February 14, 1985 meeting of the board [3]—after DLJ had advised the board that it shortly would be making a power-sale proposal based on its evaluation of the responses to the RFP, but before it actually tendered the proposal—board member Willem Westerbaan asserted that such a proposal could not be entertained without reopening the RFP to solicit power-sale proposals.[4] Although not all members of the board were in agreement with Westerbaan's assessment, App. 213, board member Roy Adams wrote to DLJ's attorney on February 21, 1985, explaining on behalf of the board that if DLJ were to conclude that it would be more advantageous for WAPA to have a third-party arrangement than outright ownership, it would be necessary to issue a new RFP, App. 2134. The record does not disclose a response to this letter by DLJ.

DLJ submitted the second proposal to WAPA on February 25, 1985. App. 2136. It contemplated that DLJ and Sunlaw Energy Corp., "an experienced energy developer," would form a corporation, to be called Caribbean Energy Co., Inc. (CEC), that would finance, design, construct, and own a 20–megawatt cogeneration plant that would sell electricity and steam to WAPA. DLJ, through CEC, would act as a principal in this undertaking. The plant would utilize generators manufactured by M.A.N., a German firm that submitted one of the six proposals that DLJ evaluated. In a March 1 follow-up letter, however, DLJ told WAPA that it would be willing to participate on the same terms but using the equipment of a different manufacturer, if WAPA so preferred. App. 2147. Under the proposal WAPA would be required to purchase a minimum amount of electricity and steam each year for 20 years, at a specified price. At the end of the 20 years WAPA would have an option to purchase the plant.

A suggested letter of intent was approved by WAPA in a board meeting on March 14; Westerbaan dissented from this approval and walked out of the meeting. After some revisions, a contract embodying the proposal was approved at a board meeting on May 23, 1985, with Westerbaan again the sole dissenter. Among its provisions was one declaring that no relationship of agency would exist between the parties. App. 2198. Under the terms of the contract, WAPA is obligated to purchase at least 140 million kilowatt-hours of electricity per year, at 4.5 cents per kilowatt-hour. It must also purchase at least 630 million pounds of steam each year, at $2 per thousand pounds. Both of these prices are subject to adjustment over the term of the contract. WAPA must supply the plant with fuel, lubricating oil, and water as required. The district court found that the total cost to WAPA will compare favorably with what it presently costs WAPA to produce energy at its existing plant, describing the potential savings to WAPA and its customers as "impressive." 636 F.Supp. at 34.

On March 13, 1985, upon learning of the DLJ proposal, General Engineering Corp., one of the disappointed responders to the RFP, wrote to WAPA offering to build a generating plant and sell the output to WAPA at a rate lower than that proposed by DLJ. App. 2233. WAPA apparently made no response, either to this letter or to two follow-up letters dated March 27 and May 30. App. 2234, 2236.

South Shore Alumina, Inc. also demonstrated interest at this time in selling power to WAPA. This company held an option to purchase Martin Marietta's property on the south shore of St. Croix. The property had formerly been used to process bauxite,

---

**3.** The minutes of this meeting were adverted to at oral argument, but they are not a part of the record in this case.

**4.** In addition to his duties as a WAPA board member, Westerbaan was utility manager at the

Martin Marietta alumina plant. Martin Marietta, which has submitted a brief *amicus curiae* to this Court, desires to sell cogenerated power to WAPA.

and contained an electric generating plant that was then not in use. South Shore offered to sell WAPA the output of this plant, but WAPA went ahead with its contract with CEC, asking DLJ to look into the possibility of buying power from South Shore on an interim basis. DLJ and South Shore met, but reached no agreement.

Governor Juan Luis then intervened on South Shore's behalf. A series of meetings were held involving WAPA, South Shore, and the Governor. Roy Adams and Herman Richardson, WAPA board members, stated at these meetings that the agreement with DLJ was not yet final, though in fact the contract had already been signed. Upon learning that WAPA's agreement with DLJ was final, and therefore precluded the sort of arrangement that South Shore proposed, the Governor acted to reconstitute WAPA's board. He removed Adams and Richardson, and excluded Margaret Creque and Benjamin Banks on the ground that their terms of office had expired. He then placed three of his own nominees on the board. The Governor signed a new power-sale agreement with South Shore, submitting it to WAPA for ratification. His position was that the contract with DLJ was void, since the board that signed it lacked a quorum, Creque and Banks not having been entitled to office at the time the agreement was signed.

Three lawsuits, which the district court eventually consolidated for trial, were filed. In the first action, Creque and Banks sued the Governor for reinstatement to the board. The district court ordered them reinstated, and the Governor appealed. On October 14, 1986, this Court affirmed the district court. *Creque v. Luis,* 803 F.2d 92 (3d Cir.1986). In the second action, General Engineering Corp. sued WAPA to enjoin implementation of the contract with DLJ, and CEC intervened. The district court ruled in WAPA's favor. General Engineering timely appealed to this Court, but thereafter withdrew its appeal.

The present appeal is from the third action, brought by CEC against WAPA, in which CEC sought a determination that its contract with WAPA was valid and requested an injunction preventing interference with the contract. The district court granted the relief CEC requested. On appeal, WAPA contends that the contract is invalid because it violates both the Virgin Islands conflict of interest statute, 3 V.I.C. §§ 1101–03, and WAPA's competitive bidding statute, 30 V.I.C. § 116. WAPA also argues that a party to a contract may not be enjoined from interfering with that contract.[5]

## II.

### A. *Conflict of Interest Statute*

■ The Virgin Islands conflict of interest statute, 3 V.I.C. § 1102, provides:

No territorial officer or employee shall:

(1) be financially interested in any contract made or negotiated by him in his official capacity, or by any public agency of which he is a member.

. . . . .

(3) have any interest, financial or otherwise, direct or indirect, or engage in any business or transaction or professional activity, or incur any obligation of any nature, which is in substantial conflict

---

5. Amicus curiae Martin Marietta Aluminum Properties, Inc., submitted a brief arguing that the contract between DLJ and WAPA should be invalidated because it abridges the Public Utility Regulatory Policies Act of 1978, Pub.L. No. 95–617, 92 Stat. 3117 (codified in scattered sections of 16 U.S.C.), and Virgin Islands Act No. 5006, 30 V.I.C. §§ 46–50. The parties did not raise this issue either in the district court or on appeal.

Generally, new issues raised by an amicus are not properly before the court. *See United Parcel Service v. Mitchell,* 451 U.S. 56, 60 n. 2, 101 S.Ct. 1559, 1562, n. 2, 67 L.Ed.2d 732 (1981); *Knetsch*

*v. United States,* 364 U.S. 361, 370, 81 S.Ct. 132, 137, 5 L.Ed.2d 128 (1960). In exceptional circumstances, however, the federal courts will suspend this rule. *Consumers Union of United States, Inc. v. FPC,* 510 F.2d 656, 662 & n. 9 (D.C.Cir.1975). Jurisdictional issues may give rise to such exceptional circumstances. *See, e.g., American Meat Institute v. EPA,* 526 F.2d 442, 449 (7th Cir.1975). Since Martin Marietta's arguments present no jurisdictional issues or any extraordinary considerations, we decline to address the new issues raised in its brief.

with the proper discharge of his duties in the public interest and of his responsibilities as prescribed in the laws of the Virgin Islands.

. . . . . .

(5) wilfully and knowingly disclose, for pecuniary gain to any other person, confidential information acquired by him in the course of and by reason of his official duties or use any information for the purpose of pecuniary gain.

Section 1103 in turn defines the conduct prohibited by § 1102(3):

A person subject to this chapter has an interest which is in substantial conflict with the proper discharge of his duties in the public interest and of his responsibilities as prescribed in the laws of the Virgin Islands or a personal interest, arising from any situation, within the scope of this chapter, if he will derive a direct monetary gain or suffer a direct monetary loss, as the case may be, by reason of his official activity.

■ During the period of time covered by the appointment letters DLJ was a "territorial officer or employee" within the contemplation of § 1102. "Territorial officer or employee" is defined to include "employees and consultants of any branch of the Government or public agency employed on a contract or fee basis." 3 V.I.C. § 1101(8). Although DLJ's relationship with WAPA, as established by the letters of appointment, was not well defined, we are satisfied that at least part of DLJ's duties constituted it a "consultant" for purposes of this provision. We deem it unimportant that the fee arrangement may not have been clearly specified, since it is plain that both parties understood that DLJ would be compensated for its services.

Having determined that DLJ was subject to the strictures of the Virgin Islands conflict of interest law, the issue becomes whether in any of its dealings it ran afoul of those strictures. We hold that it did not.

■ Section 1102(1) forbids an entity such as DLJ to "be financially interested in any contract made or negotiated by [it] in [its] official capacity." Here DLJ was financially interested, through its subsidiary CEC, in the contract of May 23, 1985 with WAPA. But DLJ neither made nor negotiated the contract while acting in its official capacity, that is, as WAPA's consultant. DLJ's last appointment extended only through February 1, 1985. The contract was proposed by DLJ on February 25, and was signed on May 23.[6] Thus, during the time the contract was negotiated and signed DLJ was no longer serving as WAPA's consultant. Consequently, there was no violation of § 1102(1).

■ Section 1102(3), together with § 1103, forbids DLJ to engage in any transaction wherein it "will derive a direct monetary gain or suffer a direct monetary loss, as the case may be, by reason of [its] official activity." This provision does not forbid benefitting from the public trust: it forbids only violating that trust. Here the task committed to DLJ was to compose a package, consisting of financial and technical elements, that would meet the public's energy needs while remaining within the confines of WAPA's financial exigencies. The solution that DLJ proposed includes the participation of its subsidiary CEC, and this participation is the vehicle by which DLJ is to be compensated for its services. Had DLJ concealed the fact of its interest in CEC, a different situation would have been presented. But DLJ made it pellucid from the outset that CEC was to be its wholly owned subsidiary. WAPA was apprised fully of DLJ's interest in CEC. By entering into the contract knowing all the facts, WAPA has in effect stated that DLJ's profit from this contract was no more than what it was entitled to as compensation for the various services it had rendered and would continue to render. There was therefore no violation of § 1102(3).

---

**6.** We do not read DLJ's letter of February 25, 1985 as reflecting a continuation of DLJ's status as a consultant.

■ Neither was there any violation of § 1102(5). WAPA complains that DLJ utilized the information it obtained from reviewing the RFP responses for its own benefit. But it was precisely DLJ's role to evaluate the proposals and then to devise a financing plan incorporating the best proposal. DLJ may realize pecuniary gain from the arrangement it devised, but this is invariably the case when a private concern performs some service for the government, for which it is compensated, and in the course of performing the service makes use of the information obtained by virtue of that relationship.

WAPA argues that the conflict-of-interest question is governed by the Supreme Court's opinion in *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961). That case concerned a contract between the Atomic Energy Commission and Mississippi Valley Generating Company, a private corporation, for the financing and construction of electric generating facilities. Negotiations leading up to the contract were conducted on the AEC's behalf in part by one Wenzell, who was also an officer of First Boston Corporation, an investment banking firm later retained as the financing agent for the project. The Supreme Court held that the contract violated the federal conflict-of-interest statute, 18 U.S.C. § 434, because of Wenzell's division of loyalties between the AEC and First Boston.

*Mississippi Valley* is not controlling here. First, the Supreme Court was applying a federal statute worded significantly differently from the Virgin Islands statute involved in this case. Second, the holding there is explicitly limited to its facts. *See Mississippi Valley*, 364 U.S. at 562, 81 S.Ct. at 315. Third, there is no conflict in this case of the sort found in *Mississippi Valley*. There Wenzell was subject to a temptation: any action he took in encouraging the AEC to contract with Mississippi Valley could be expected to redound to his benefit through First Boston's participation in the financing. In the case before us DLJ was presented with no such temptation. It was not in competition with any of the responders to the RFP, since none was willing to include in its proposal the requisite financing. 636 F.Supp. at 31. DLJ's role was limited to evaluating the proposals and presenting the one it considered the best with a financing package of its devising. Unlike Wenzell, it had no interest in urging the government to choose one of the proposals over any other.

**B. *WAPA's Competitive Bidding Statute***

WAPA seeks to annul the contract on the ground that it was issued in violation of the applicable competitive bidding statute. 30 V.I.C. § 116 provides:

All purchases and contracts for supplies for [sic?] services, except for personal services, made by the Authority, including contracts for the construction of facilities of the Authority, shall be made after advertisement for bids sufficiently in advance of opening bids for the Authority to secure appropriate notice and opportunity for competition; Provided, That where the expense estimated to be necessary in connection with the purchase or work does not exceed two thousand five hundred (2,500) dollars the same may be carried out without advertisement for bids.

Section 116 contains several exceptions, including:

Advertisement for bids shall not be required, however, when—

(3) professional, financial (including financial printing) or other expert services or work are required and the Authority shall deem it best in the interest of good administration that contracts therefor be made without such advertisement....

30 V.I.C. § 116(a)(3).

■ The primary purpose of a competitive bidding statute is to protect against fraud, collusion, and favoritism in the issuance of public contracts. *See Gostovich v. West Richland*, 75 Wash.2d 583, 452 P.2d 737, 738 (1969); 64 Am.Jr.2d, Public Works and Contracts § 30. There are certain types of public contracts, however, with respect to which competitive bidding might be counterproductive and therefore inappropriate. Contracts for professional

services are almost universally recognized to be such an exception to the general rule. The offerors of professional services possess varying degrees of skill, and therefore the lowest bidder does not necessarily represent the best value for the public. As one court has stated: "The rationale is that the legislature must have intended to leave public bodies free to judge the professional qualifications of those who perform services requiring scientific knowledge and professional skill." *Waste Management v. Wisconsin Solid Waste Recycling Authority,* 84 Wis.2d 462, 267 N.W.2d 659, 665 (1978).

■ It is widely held that professionals such as engineers and financial advisers fall within the professional services exception. *See* 64 Am.Jur.2d, Public Works and Contracts § 43. Given the difficulties of WAPA's financial position, WAPA was entitled to conclude that the public's best interests required hiring the services of a financial adviser expert in arranging third-party financing of utility plants—particularly given the frequency with which such financing efforts have failed in the past. Since DLJ offered professional services, WAPA's selection of it as financial adviser was not subject to the competitive bidding requirement. It follows then that WAPA was free to accept, or reject, any proposal that DLJ, in the exercise of its professional judgment, should recommend.

*Autotote Ltd. v. New Jersey Sports and Exposition Authority,* 85 N.J. 363, 427 A.2d 55 (1981), a leading case in the field, supports this reasoning. In *Autotote,* the New Jersey Supreme Court found that the services of a race track totalisator company were sufficiently professional to fall within both the "professional services" and "public convenience" exceptions to a competitive bidding statute. The majority held that the highly technical nature of the computer services and equipment provided placed the contract within the exception. The concurring opinion stated that the essential distinguishing factor should be whether *"public convenience*—that is, how the interest of the public, not that of the governmental entity or any other individual party, will best be served." *Autotote,* 427 A.2d at 60.

It is as true here as in *Autotote* that "[r]eliability is so important to the success of operations ... that selection of the ... system ... could not have been subjected to the even limited uncertainties of public bidding." *Autotote,* 427 A.2d at 61. *See also Waste Management, supra* (statutory bidding provisions must be read in light of the reasons for their enactment and must not deny authorities the ability to deal with problems in a sensible, practical way).

■ The professional services exception in the WAPA statute, among other things, makes clear that the board has the discretion to avoid bidding when it is "in the interest of good administration." 30 V.I.C. § 116(a)(3). The contract between WAPA and CEC presents even more compelling reasons to be concerned with reliability and with certainty of completion for the benefit of the ratepaying and energy-using public than does the contract in *Autotote.* Evidence presented at trial demonstrates the very real possibility of an imminent energy emergency, and the overwhelming majority of other efforts competitively to bid similar projects have been notably unsuccessful. App. 892–94. The trial court thus was justified in finding that WAPA acted "in the best interest of good administration" when it approved the DLJ contract.

This conclusion might not follow so readily if there were any suggestion in this case of fraud or collusion: if, for example, there were an allegation that WAPA and DLJ were not dealing with each other at arm's length, or that the bid DLJ tendered were rigged. But no such charge has been made.

## C. *Validity of Injunction*

WAPA argues in its brief that a court may not enjoin a party to a contract from interfering with that contract. Because WAPA did not raise this issue in the district court, we decline to pass on it. *See Leizerowski v. Eastern Freightways, Inc.,* 514 F.2d 487, 491 (3d Cir.1975).

## III.

We hold that the contract between CEC and WAPA does not violate the Virgin Is-

lands conflict of interest and WAPA competitive bidding statutes. Accordingly, the judgment of the district court will be affirmed.