**SEA AIR SHUTTLE CORPORATION d/b/a VISS and Sea Air Shuttle Corporation of the Virgin Islands, Plaintiffs,**

v.

**The VIRGIN ISLANDS PORT AUTHORITY and Caribbean Airboats, Inc.**

**Civ. A. No. 1991–0009.**

District Court, Virgin Islands, D. St. Croix.

March 13, 1992.

Andrew C. Simpson, Britain H. Bryant, Christiansted, V.I., for plaintiffs.

Carey–Anne Moody, Christiansted, St. Croix, V.I., Maria Tankenson Hodge, St. Thomas, V.I., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge, Sitting by Designation.

This action concerns a dispute over the purported award[1] by defendant Virgin Is-

---

1. Plaintiffs, Sea Air Shuttle Corporation d/b/a VISS and Sea Air Shuttle Corporation of the Virgin Islands, contend that an exclusive lease has been awarded, while defendants assert that only an opportunity to negotiate a lease has been granted. As this issue has no effect upon this decision, the Court offers no opinion on whether a lease has been awarded. For purposes of convenience in this opinion, the Court will refer to a lease as if one exists between

lands Port Authority ("VIPA") of an exclusive lease to defendant Caribbean Airboats, Inc. ("CAI") to use seaplane ramps owned by VIPA. Defendant VIPA moves for summary judgment on the three counts of the third amended complaint.[2] Plaintiffs Sea Air Shuttle Corporation and Sea Air Shuttle Corporation of the Virgin Islands (referred to collectively as "plaintiff Sea Air") oppose VIPA's motion for summary judgment and have filed a cross-motion for summary judgment. In addition, Sea Air has moved for a preliminary and permanent injunction and for summary judgment on the complaint for declaratory relief. Defendants VIPA and CAI respond to this cross-motion for summary judgment and motion for preliminary and permanent injunction by arguing that defendants are entitled to judgment as a matter of law. For the reasons stated below, I shall grant defendant VIPA's motion for summary judgment and deny plaintiff Sea Air's cross-motion for summary judgment and motion for preliminary and permanent injunction.

## I. INTRODUCTION

Prior to September of 1989, when Hurricane Hugo struck the United States Virgin Islands, a seaplane service was operated by Virgin Islands Seaplane Shuttle ("VISS"). VISS provided passenger air service between downtown Christiansted, St. Croix, downtown Charlotte Amalie, St. Thomas, downtown San Juan, Puerto Rico, downtown Roadtown, Tortola, and St. John. As a result of destruction caused by Hurricane Hugo, VISS went out of business and seaplane service between the islands was interrupted. Among the physical structures that VISS used prior to its demise were seaplane ramps on St. Thomas and St. Croix owned by VIPA.

In early 1990, VIPA issued a Request For Proposals ("RFP") to lease the seaplane ramps on St. Thomas and St. Croix. Caribbean Airline Services, Inc. ("CAS") was one of eight companies that presented a proposal to VIPA before the June 22, 1990 deadline to submit lease proposals. Sea Air did not submit a proposal. VIPA's staff reviewed the eight proposals and presented three to VIPA's Governing Board as the most viable of the eight proposals submitted. The CAS proposal was one of three that the staff of VIPA recommended to VIPA's Governing Board for additional consideration. The two other proposals recommended for further consideration were those submitted by American Aircraft Management Co. and defendant CAI. It is undisputed that VIPA's staff considered the proposal submitted by CAS to be the most viable of the three bids recommended for further consideration by VIPA's Governing Board.

On June 23, 1990, Anthony Tirri, president of CAS, and Arnaldo Deleo, president of Sea Air, entered into an oral agreement in which CAS agreed to assign its interest in the VIPA lease proposal to Sea Air. *See* Deleo Aff. at ¶ 4. On August 29, 1990, the three finalists—CAS, American Aircraft Management Co., and CAI—made presentations to the Governing Board of VIPA. CAS and Sea Air presented a proposal together and CAS submitted a written statement informing VIPA that "CAS [had] agreed to transfer its lease of the seaplane bases ..." *See* Sea Air's Opposition to CAI's Motion to Dismiss at Exhibit A. The proposal submitted by CAS and Sea Air

---

defendants Virgin Islands Port Authority and Caribbean Airboats, Inc. This mere use of convenience in expression should not be interpreted as a conclusion that a lease in fact exists between the two defendants.

**2.** By Order of October 28, 1991, the Court dismissed counts 3, 4, 5, and 6 of the second amended complaint. The remaining counts were thus counts 1 and 2 of the second amended complaint. Plaintiffs moved to amend the second amended complaint to add additional counts. *See* Plaintiffs' Motion To File Third

Amended Complaint. By Order of February 26, 1992, the Court granted in part and denied in part plaintiffs' motion to file a third amended complaint. *See* Order of February 26, 1992. Pursuant to the February 26 Order, the Court accepted the pleading of all claims that had been fully briefed and rejected the amended counts asserted by plaintiffs which would require additional briefing. The third amended complaint contains three (3) counts which the Court addresses in this Memorandum and Order.

made clear that Sea Air would operate the seaplane service if VIPA approved the CAS proposal. The proposal submitted by CAS and Sea Air specifically stated:

> [t]wo sister corporations have been established to operate VISS in Puerto Rico and the Virgin Islands for logistical and financial reasons. SASH [Sea Air Shuttle Corporation] will operate VISS using initially Mallard aircraft leased from CAS. The new airline will operate with many ex-old VISS employees some of whom have already been employed by SASH. The organization's officers and managers will be: A. Deleo, President CEO (EAL); H. Worman, Director Maintenance (Ex VISS); J.S. Jervis, Director Flt. Operations (Ex VISS); J. Coto, Chief Pilot (Ex VISS); John Richards, Shuttle Director (Ex VISS).

*Id.*

The individuals representing CAS and Sea Air respectively at the August 29, 1990 meeting were Anthony Tirri, president of CAS, and Arnaldo Deleo, president of Sea Air. During the CAS/Sea Air presentation, Mr. Tirri stated:

> As President, we [CAS] purchased the assets of V.I. Seaplane Shuttle when they went into bankruptcy for the purpose of taking over and started Sea Air International. Caribbean Airline Services will be the leasing corporation which will own and lease aircraft, the same type as previously used ...

*See* Sea Air's Opposition to CAI's Motion to Dismiss at Exhibit B, ¶ 10 (Minutes of the VIPA Board. Meeting of August 29, 1990). In the August 29, 1990 presentation, CAS and Sea Air made clear that Sea Air would operate the seaplane service, while CAS would lease the seaplanes.

The August 29, 1990 CAS/Sea Air proposal listed the following CAS/Sea Air assets and attributes in support of the position that Sea Air represented the best of the three finalists before VIPA: (1) Sea Air's full use and control of three seaplanes with an option on a fourth seaplane; (2) Sea Air's employment of twenty-six (26)

employees in anticipation of commencing seaplane service, many of whom were former non-management employees of VISS; (3) Sea Air's completion of all necessary flight training; (4) Federal Aviation Administration (FAA) approval of flight training, operations, and maintenance manuals; (5) Department of Transportation ("DOT") certification; and (6) a proposed annual fee of $150,000 for use of the seaplane ramps. In contrast, at the time of the August 29 proposal meeting, defendant CAI (1) neither owned nor leased any aircraft; (2) employed no pilots, mechanics, or other non-management personnel; (3) possessed no FAA Carrier Operating Certificate or FAA approved flight training, operations, or maintenance manuals; (4) possessed no DOT certification; and (5) proposed a smaller annual fee to lease the seaplane ramps than the fee proposed by CAS/Sea Air.

On September 10, 1990, CAS and Sea Air agreed in writing that CAS would assign its interest in the lease proposal to Sea Air.[3] The September 10, 1990 stockholders' agreement entered into by Sea Air Shuttle Corporation, CAS, Anthony C. Tirri, Salvatore J. Labate, Arnaldo Deleo and other Sea Air Shuttle Corporation investors ("the stockholders' agreement") provided that CAS would transfer all of its rights in the seaplane ramp bid or lease to Sea Air Shuttle Corporation of the Virgin Islands *in the event* that the CAS bid was accepted by VIPA. *See* Sea Air's Opposition to CAI's Motion to Dismiss at Exhibit C.

By letter of October 4, 1990, Robert S. Griggs, counsel for Sea Air, informed Eric Dawson, Commissioner of VIPA, that the stockholders' agreement had been signed and that the agreement's assignment provisions were contingent on VIPA's acceptance of the CAS proposal. The October 4 letter included, *inter alia*, (1) a request that VIPA treat the CAS proposal as a Sea Air proposal; and (2) information requested by VIPA regarding Sea Air shareholders. The letter listed Sea Air Shuttle Corporation of the Virgin Islands' shareholders as

---

**3.** This written agreement ("the stockholders' agreement") between CAS and Sea Air con-

firmed the oral understanding reached by Tirri and Deleo on June 23, 1990.

Arnaldo Deleo, Roland H. Moore, Robert S. Griggs, Betty F. Griggs, Peter Nelson, Lewis F. Huck, Virginia Huck, Irene Cerqueira, Anthony C. Tirri, and Salvatore J. Labate. Also, the October 4 letter represented that Sea Air Shuttle Corporation of the Virgin Islands and Sea Air Shuttle Corporation possessed the same shareholders. Finally, the October 4 letter stated that Anthony C. Tirri was the sole shareholder of CAS.

On November 26, 1990, pursuant to a request by VIPA, Sea Air ratified CAS' June 18 proposal to lease the seaplane ramps. At no time did VIPA explicitly affirm or reject the validity of the purported assignment made by CAS to Sea Air or the acceptability to VIPA of the arrangement contemplated by CAS and Sea Air. VIPA made clear through its conduct, however, that it intended to consider the CAS/Sea Air proposal on the terms contemplated by CAS and Sea Air.

After reviewing the August 29, 1990 oral presentations of the three finalists—CAS/Sea Air, American Aircraft Management Company, and defendant CAI—VIPA's Governing Board requested that the Virgin Islands Department of Justice conduct a background investigation of the principals of the three companies being considered as lessees of the seaplane ramps.[4] On November 28, 1990, VIPA's Governing Board voted to hold executive session to receive the investigative reports from the Department of Justice.

An investigator from the Virgin Islands Department of Justice reported to VIPA's Governing Board during this executive session. The investigator informed the Board that the president and chief executive officer of American Aircraft Management Company had recently been indicted in Arizona for depositing funds in financial institutions in violation of federal currency transaction reporting requirements. Further, the investigator reported that Anthony Tirri, CAS' president, was previously the president of another airline that had received a number of Federal Aviation Association ("FAA") citations and fines for safety violations.[5] The investigator also reported that Salvatore Labate, a principal of Sea Air until early November 1990, had been indicted but acquitted on charges of conspiring to smuggle drugs into the United States in 1976.[6] The investigator addressed the relationship between CAS and Sea Air by advising VIPA's Governing Board that the leasing arrangement between CAS and the two Sea Air corporations would enable CAS to avoid any financial responsibility in the event that the service conducted by Sea Air encountered financial or cost difficulties. The investigator stated that this arrangement created a substantial risk for VIPA since CAS, the lessor of the seaplanes, would hold substantially all of the assets used by Sea Air.[7]

Prior to VIPA's November 28, 1990 meeting, CAS and Sea Air informed VIPA that Labate had relinquished any possible

---

4. In exploring the backgrounds of the principals of the three finalists, the investigator conducted National Criminal Intelligence System checks (NCICs) through a computer link up with the Federal Bureau of Investigations. Also, the investigator conducted financial profiles on each of the principals by running a credit check on each individual. Finally, the investigator reviewed certain newspaper articles regarding the principals.

5. The investigator's report stated that Mr. Tirri was the founder of a now defunct airline which had been cited for FAA violations.

6. Also, the investigator's report raised certain questions concerning the circumstances surrounding Labate's acquittal. Further, the report stated that Mr. Labate was Mr. Tirri's uncle.

7. After a review of the assignment and leasing arrangement between CAS and Sea Air (referred to as SAS), the investigator stated: "Mr. Tirri is placing [SAS] between VIPA and his company [CAS]. If [SAS] were to get into trouble, Mr. Tirri could relinquish any and all responsibility. With [CAS] leasing all equipment to [SAS], most of the profits will go to [CAS] in leasing cost. If a problem were to arise the assets of [CAS] and Mr. Tirri would not be in danger of cost responsibility to VIPA. This looks to be the situation Guy American Airways was in when the FAA fined them $50,000 for safety violations." V.I. Department of Justice Memorandum (October 29, 1990).

association with Sea Air.[8] At the time of the November 28, 1990 VIPA meeting, Tirri owned 4.5% of Sea Air's stock and represented that he was the sole shareholder of CAS. Subsequent to the November 28 meeting, Tirri relinquished any and all control over Sea Air.

The investigator reported that no record of FAA violations or criminal connection or activity was found with regard to the principals and officers of CAI.

After hearing the investigator's report, VIPA's Governing Board voted unanimously to negotiate for leases of the seaplane ramps with defendant CAI. VIPA's Commissioner Eric Dawson provided two reasons for VIPA's rejection of the CAS/Sea Air proposal. First, Dawson cited Mr. Tirri's involvement in FAA violations with Guy Airlines. Specifically, Dawson stated:

> [t]he Board also received information on [CAS] in which the Board was told first of all with Mr. Tirri being involved in Guy American Airways had some FAA violations.... Well, right there and then, is a question of safety, whether or not there would be shortcuts to maintain the airboats to the extent that we knew that it is a very difficult operation from what we've seen in previous history—[a]s a matter of fact—on that safety question, I think it can be documented going back from the days when Charlie Blair owned the sea, the gooses as they call them ... and we've had problems with both his regime and the regime of V.I. Seaplane Shuttle."

Dawson Dep. at 88.

Second, Dawson cited Labate's indictment for drug smuggling as a reason for rejecting the CAS/Sea Air proposal. Dawson stated:

> Mr. Labate, who we learned is the uncle of Mr. Tirri, had been indicted up in New York in the Poconos for drug transaction.... Well, the Board is concerned. I mean first of all, we have a drug problem in and around the Virgin Islands,

and someone having airplanes to his or her disposal, which we all know is one of the vehicles by which drugs are transported ... we believed that this was not a proper party to negotiate with.

*Id.* at 87.

On January 23, 1991, in reaction to VIPA's choice of CAI rather than Sea Air, Sea Air filed a complaint in the Territorial Court of the Virgin Islands against CAI and VIPA. The Territorial Court dismissed the action for lack of subject matter jurisdiction. In February of 1991, Sea Air filed the instant action.

## II. DISCUSSION

### A. *Standard For Summary Judgment.*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court does not resolve questions of disputed fact, but rather simply decides whether there is a genuine issue of fact which must be resolved at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Ettinger v. Johnson,* 556 F.2d 692 (3d Cir. 1977). The facts must be viewed in the light most favorable to the non-moving party, and reasonable doubt as to the existence of a genuine issue of material fact is to be resolved against the moving party. *Continental Insurance Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982).

In this case, both parties agree that there are no genuine issues of material fact. With respect to the pending motions for summary judgment and permanent and preliminary injunction, the Court agrees that there are no genuine issues of materi-

---

**8.** In a memorandum prepared for VIPA, the Virgin Islands Department of Justice Investigator stated that in spite of Mr. Tirri's disclaimer about Labate's role, "there is information showing that Salvatore Labate has some interest in [CAS] and in turn would have interest in SAS and/or SAS–PR and its affiliate [SAS–VI], who would conduct the day to day operations of the seaplane shuttle." *See* V.I. Department of Justice Memorandum (October 29, 1990).

al fact. As discussed below, VIPA has demonstrated as a matter of law that plaintiffs' claims lack merit. Under Rule 56(c), this Court must accordingly grant summary judgment for defendants on counts I, II, and III of the third amended complaint.

### B. Allegations About Board Meeting

#### 1. 29 V.I.C. § 542

Plaintiff Sea Air alleges in its third amended complaint that "[u]pon information and belief the Board of V.I.P.A. was illegally constituted at all times relevant to this action in that the Board did not have the statutorily required quorum." *See* Third Amended Complaint at ¶ 21. 29 V.I.C. § 542 states:

(a) The powers of the Authority [VIPA] shall be exercised by a Governing Board consisting of the members of the Authority acting as a board. Within one hundred and twenty (120) days after this chapter becomes effective, the Board shall meet at the call of the Governor and organize, elect a Chairman, Vice Chairman, and, as soon as practicable, shall appoint an Executive Director of the Authority who shall be authorized to attend all meetings of the Board but not entitled to vote.

(b) *Five members of the Board shall constitute a quorum for the purpose of organizing the Authority and conducting the business thereof and for all other purposes, and all action shall be taken by a vote of the majority.*

29 V.I.C. § 542.

VIPA admits that the terms of four (4) of the nine (9) members of VIPA's Governing Board had expired prior to the November 28, 1990 meeting. The remaining five (5) members of VIPA's Governing Board were, however, in good standing and all members of VIPA's Governing Board were present at the November 28, 1990 meeting. *See* Dawson Aff. at ¶ 4–7 (May 24, 1991). Sea

Air has provided no evidence contradicting or challenging the affidavit of Eric Dawson, Commissioner of Economic Development and Agriculture of the Government of the Virgin Islands and Chairman of the Governing Board of the Virgin Islands Port Authority.[9] There is no material issue of fact regarding the presence of a quorum. Therefore, summary judgment shall be entered in favor of defendant VIPA on the claim that it violated 29 V.I.C. § 542 in conducting its November 28, 1990 Governing Board meeting without a quorum. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

#### 2. Compliance With Competitive Bidding Statute

Plaintiff Sea Air seeks to annul any lease between VIPA and CAI on the ground that VIPA failed to comply with the competitive bidding requirements set forth in 29 V.I.C. § 572. *See* Plaintiffs' Third Amended Complaint at ¶ 7. 29 V.I.C. § 572 states:

[a]ll purchases and contracts for supplies or services, except for personal services, made by the Authority, including contracts for construction of facilities of the Authority, shall be made after advertisement for bids sufficiently in advance of opening bids for the Authority to secure appropriate notice and opportunity for competition; provided, that where the expense estimated to be necessary in connection with the purchase or work does not exceed two thousand five hundred (2,500) dollars the same work may be carried out without advertisement for bids. Advertisements for bids shall not be required, however when— ... (3) *professional, financial (including financial printing) or other expert services or work are required and the Authority shall deem it best in the interest of*

---

**9.** Sea Air's principle argument against summary judgment is that "[i]t is entitled to discovery before a motion for summary judgment involving factual issues is decided." *See* Sea Air's Opposition To VIPA's Motion For Summary Judgment On Second Amended Complaint at 2 (June 12, 1991). The Court has afforded Sea Air two extensions to conduct discovery since Sea Air filed this response. *See* Orders of June 3, 1991 and November 14, 1991. Despite the lengthy briefing on numerous issues before the Court, Sea Air has failed to raise an issue of fact regarding the presence of five members of VIPA at the Board Meeting.

*good administration that contracts therefor be made without such advertisement ...*

*Id.*

VIPA argues that the proposals for leasing the seaplane ramps were technical and professional in nature and therefore clearly exempt from the competitive bidding requirements of Section 572. Further, VIPA contends that it fully complied with the requirements of 29 V.I.C. § 572.

Professional and expert services exemptions from public bidding requirements are common and routine. *See General Engineering Corp. v. Virgin Islands Water And Power Authority,* 805 F.2d 88 (3d Cir.1986), *citing Waste Management v. Wisconsin Solid Waste Recycling Authority,* 84 Wis.2d 462, 267 N.W.2d 659, 665 (1978). The Court concludes that the leases of the seaplane ramps qualify for the professional and expert service exemption of 29 V.I.C. § 572(3). Further, even if the leases of the seaplane ramps were subject to the competitive bidding requirements of Section 572, plaintiff Sea Air has failed to demonstrate any violation of the statutory bidding requirements. The Court therefore also concludes that VIPA complied with the requirements of 29 V.I.C. § 572.

The Third Circuit explained the rationale behind competitive bidding statutes and professional services exemptions in *General Engineering Corp.,* 805 F.2d 88 (3d Cir. 1986). Specifically, the Third Circuit stated:

> [t]he primary purpose of a competitive bidding statute is to protect against fraud, collusion, and favoritism in the issuance of public contracts.... There are certain types of public contracts, however, with respect to which competitive bidding might be counterproductive and therefore inappropriate. Contracts for professional services are almost universally recognized to be such an exception to the general rule. The offerors of professional services possess varying degrees of skill, and therefore the lowest bidder does not necessarily represent the best value for the public. As one court has stated: "the rationale is that the

legislature must have intended to leave public bodies free to judge the professional qualifications of those who perform services requiring scientific knowledge and professional skill."

*Id.* at 94–95, *quoting Waste Management v. Wisconsin Solid Waste Recycling Authority,* 84 Wis.2d 462, 267 N.W.2d 659, 665 (1978).

In other words, as I stated in *Abramson v. Georgetown Consulting Group, Inc.,* 765 F.Supp. 255 (D.V.I.), *aff'd* 952 F.2d 1391 (3d Cir.1991) "[c]ontracts for professional services are more appropriately entered into based on factors other than price. The scientific knowledge and professional skill of independent professionals is difficult to quantify." *Id.* at 262–263.

Having explained the rationale for the professional services exemption, the Court must now determine whether the services to be provided by CAI in the instant case qualify for the exemption. Plaintiff Sea Air urges the Court to view the leases of the seaplane ramps as purely a real estate transaction. This position oversimplifies the VIPA/CAI lease and ignores the principle that in deciding whether the professional service exception is fulfilled, a Court must focus on the nature of the work implicit in the proposal or bid. *See General Engineering Corp. v. Virgin Islands Water And Power Authority,* 636 F.Supp. 22, 42 (D.V.I.1985), *aff'd* 805 F.2d 88 (3d Cir.1986); *Curtis Ambulance of Florida, Inc. v. Board of County Commissioners of the County of Shawnee, Kansas,* 811 F.2d 1371, 1379–80 (10th Cir.1987), *quoting Marx v. Hartford Accident & Indem. Co.,* 183 Neb. 12, 157 N.W.2d 870 (1968). In this case, the work inherent in the lease of the seaplane ramps is the provision of seaplane service between the United States Virgin Islands and other islands.

The Third Circuit recognized that the professional services exception allows a public agency the discretion to avoid competitive bidding when "it is 'in the interest of good administration.'" *General Engineering Corp.,* 805 F.2d at 95 (citations omitted). Further, the Third Circuit identi-

fied the public interest in reliability as a paramount concern in allowing services of an expert nature to be contracted for without compliance with competitive bidding requirements. *Id.* Here, the services in question involved the provision of air transportation between islands by way of airplanes capable of taking off and landing on water. Certainly, interests in reliability and safety occupied a position of chief public concern. Finally, as in other cases involving the provision of expert and professional services, it is clear that the "lowest" bidder to provide seaplane services does not *a fortiori* represent the bidder capable of providing the safest and most reliable seaplane service. Accordingly, this Court concludes that the leasing of the seaplane ramps fulfilled the professional services exception of 29 V.I.C. § 572(3). This result is supported by *Curtis Ambulance of Florida, Inc. v. Board of County Commissioners of the County of Shawnee, Kansas,* 811 F.2d 1371, 1379–80 (10th Cir.1987) (holding that ambulance services constituted professional services exempt from a bidding statute) and *Autotote Ltd. v. New Jersey Sports and Exposition Authority,* 85 N.J. 363, 427 A.2d 55 (1981) (holding that a contract for the installation and servicing of a totalisator system which is a computer network designed to tabulate and categorize the bets made on every horse in each race involved services qualifying for professional services exception to statutory requirement for public bidding).

▮ Even if the leases of the seaplane ramps were subject to the competitive bidding requirements of 29 V.I.C. § 572, Sea Air has failed to demonstrate any violation of the statute. In other words, given the uncontroverted facts before the Court, it is apparent that VIPA complied with the requirements of Section 572. In construing a competitive bidding statute with the same exact language as Section 572, which governed the operations of the Virgin Islands Water And Power Authority ("WAPA"), Judge O'Brien recognized that these statutory schemes allow agencies great flexibility in their actions. Specifically, Judge O'Brien wrote:

> [a]llowance for flexibility can be seen in the language of the statute under which WAPA operates. 30 V.I.C. § 116 has broad enough scope to allow WAPA to take a variety of approaches. It does not require that a bid be awarded to the lowest bidder. It does not tell WAPA precisely how it must act in meeting bidding requirements.

*General Engineering Corp.,* 636 F.Supp. at 42, *aff'd* 805 F.2d 88 (1986).

Similarly, Section 572 allows VIPA flexibility in its actions and does not require that VIPA award the lease to the highest or most financially competitive bidder.

Sea Air's argument is ambiguous because Sea Air never alleges a particular or specific violation of the competitive bidding statute. In this case, VIPA issued a public Request For Proposals ("RFP") that resulted in the submission of eight lease proposals. Sea Air makes no allegation that VIPA violated Section 572 through any defect in advertising or soliciting bids. Further, it is doubtful that Sea Air occupies a position capable of challenging any defect in the public solicitation of proposals.[10] Although far from clear, Sea Air's argument appears to be that Section 572 required VIPA to award the lease of the seaplane ramps to Sea Air because Sea Air's proposal was more financially lucrative to VIPA than CAI's proposal.

On its face, this argument lacks merit. As the Court in *General Engineering Corp.* made clear, competitive bidding statutes like Section 572 do "not require that a bid be awarded to the lowest bidder." *Id.* at 42. Rather, VIPA is allowed flexibility in its operations and may take a variety of approaches under the statute. *Id.* Thus, the fact that VIPA chose CAI over Sea Air does not create a violation of Section 572.

---

**10.** As the Sea Air proposal was considered as part of the CAS proposal and it is apparent that Sea Air possessed notice of the RFP prior to the June 22, 1990 deadline to submit proposals, Sea Air does not possess standing to question any defect in the issuance of the RFP. *See Hospital Council of Western Pennsylvania v. City of Pittsburgh,* 949 F.2d 83, 86–87 (3d Cir.1991).

This conclusion is supported by cases upholding agency bid awards under statutory frameworks with more rigid requirements. *See West Virginia Medical Institute v. West Virginia Public Employees Insurance Board*, 180 W.Va. 697, 379 S.E.2d 501 (1989) (holding that statute which required contracts to be awarded to the *lowest responsible bidder* required subjective evaluation of quality, service, and compatibility with other programs in addition to price and stating that a contracting agency's decision deserves a presumption of correctness that can only be defeated by a showing of fraud, collusion or abuse of discretion which shocks the conscience); *King Cold Storage Warehouse, Inc. v. City of New Orleans*, 522 So.2d 169, 172 (La.Ct.App.1988) (holding that "[i]n determining what is the low bid where more than one bidder is involved the law requires the awarding of the bid to the lowest 'responsible bidder'" and "the public body with the authority to make this determination is given wide discretion ..."); *see also Appeal of Associated Sign & Post, Inc.*, 485 N.E.2d 917 (Ind.Ct.App.1985); *Baxter's Asphalt And Concrete, Inc. v. Dept. of Transportation*, 475 So.2d 1284 (Fla.Dist. Ct.App.1985); *Dickinson Company, Inc. v. City of Des Moines, Iowa*, 347 N.W.2d 436 (Iowa Ct.App.1984); *Inman's Inc. v. City of Greenfield*, 412 N.E.2d 126 (Ind.Ct.App. 1980). These cases provide further support for the conclusion that VIPA possessed wide discretion in determining which bidder to choose under Section 572. The fact that the CAS/Sea Air proposal was the most financially lucrative did not create an obligation on the part of VIPA to award the lease to Sea Air. Beyond the fact that it submitted the most financially competitive proposal, Sea Air has failed to even allege any fact that would support an inference that VIPA acted in contravention of Section 572. Thus, even if Section 572's requirements applied to VIPA's solicitation and consideration of proposals for lease of the seaplane ramps, the Court would enter summary judgment in favor of VIPA.

## C. *Due Process And Equal Protection Claims.*

■ Plaintiff's complaint raises claims under the Fourteenth Amendment of the United States Constitution. Specifically, plaintiff Sea Air alleges that "[t]he action of Defendant V.I.P.A. in awarding the contract to Defendant CAI was based on arbitrary, capricious, unlawful and irrelevant considerations which deprived Plaintiffs of their protected rights to due process and equal protection of the law and right to a fair opportunity for competition." Plaintiffs' Third Amended Complaint at Count II, ¶ 27. Both parties agree that the test for alleged violations of due process [11] and

---

**11.** Sea Air is imprecise in its complaint and briefing in identifying the variety of alleged due process violations. "The due process clause of the fourteenth amendment gives rise to three types of claims: (1) for violations of incorporated provisions of the Bill of Rights; (2) for violations of the substantive due process clause; and (3) for violations of procedural due process." *Burch v. Apalachee Community Mental Health Services*, 804 F.2d 1549, 1552 (11th Cir.1986), *rev'd on rehearing* 812 F.2d 1339 (11th Cir.1987). As Sea Air has made no claim or argument sounding in the protections afforded by the Bill of Rights, the Court must determine whether Sea Air alleges violation of procedural due process or substantive due process. Plaintiff Sea Air simply alleges that its due process rights were violated by arbitrary and capricious VIPA actions. The standard of review Sea Air urges, i.e. the rational relationship test, convinces the Court that Sea Air claims violation of its substantive due process rights. *See Student Roe By Roe v. Commonwealth of Pennsylvania*, 638 F.Supp. 929, 932–33 (E.D.Pa.1986) (recognizing that where there is no suspect classification used or fundamental right affected, the rational relation standard is applied for purposes of both equal protection and substantive due process analysis). "Unlike procedural due process, which permits a state to deprive a person of life, liberty or property when it provides a procedural remedy, substantive due process imposes limits on what a state may do regardless of what process is provided." *Madden v. City of Meriden*, 602 F.Supp. 1160, 1166 (D.Conn.1985). The conclusion that Sea Air raises a substantive due process, rather than a procedural due process, claim is bolstered by the fact that Sea Air has demonstrated no procedural defect in VIPA's solicitation of bids and has alleged no difference in the procedures applied to the bidders for lease of the seaplane ramps. Finally, examination of the record makes clear that no violation of procedural due process has occurred in the instant matter. *See Rogin v. Bensalem Township*, 616 F.2d 680, 694 (3d Cir. 1980), *cert. denied* 450 U.S. 1029, 101 S.Ct. 1737,

equal protection rights is whether the questioned government action is rationally related to a legitimate state interest. *See Rogin v. Bensalem Township*, 616 F.2d 680 (3d Cir.1980), *cert. denied* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981) (affirming district court decision that application of local zoning ordinance to condominium project was not unconstitutional). Sea Air does not contest the legitimacy of VIPA's interest in leasing the seaplane ramps and restoring seaplane service to the United States Virgin Islands. Rather, Sea Air alleges that VIPA's action of awarding the lease to CAI was arbitrary and capricious and therefore violative of Sea Air's substantive due process and equal protection rights.

■■■ The Court agrees that the allegations in Sea Air's complaint provide no basis for applying any equal protection standard except the rational relationship test. To prevail on its equal protection claim, Sea Air must convince the Court that VIPA's selection of CAI, and not Sea Air, so lacked rationality that the action constituted a constitutionally impermissible denial of equal protection. *Rogin* at 688. In addition, the Supreme Court "now applies virtually the same standard of review under the due process clause as it does in equal protection cases involving economic classifications. The test for determining whether a law comports with substantive due process is whether the law is rationally related to a legitimate state interest." *Rogin* at 689. Because the same test applies to both the alleged due process and equal protection violations, I shall address the claims together.

The facts establish that VIPA rejected Sea Air's bid because of VIPA's concerns that Sea Air was not a responsible bidder. The record developed demonstrates that VIPA possessed three concerns regarding Sea Air's operation of the seaplane service. First, VIPA was concerned that the CAS/Sea Air leasing relationship would enable the seaplane service to avoid any financial obligations to VIPA if the lease of the seaplane ramps became disadvantageous or economically burdensome. Second, VIPA was concerned that Sea Air would operate the seaplane service unsafely. Third and finally, VIPA feared that Sea Air's seaplane operations might become involved in the importation of illegal drugs.

*Urban Sanitation Corp. v. City of Pell, Alabama*, 662 F.Supp. 1041, 1047 (N.D.Ala. 1986) (granting defendant's motion to dismiss) held that an unsuccessful bidder's equal protection claim lacked merit where a municipality refused to award a contract to a bidder because of the municipality's perceived concern that plaintiff was not a "responsible bidder." [12] The *Urban Sanitation Corp.* court held that a perceived concern constituted a rational basis given the statutory concern that awards be to responsible bidders. Here, VIPA possessed greater discretion in soliciting proposals and awarding bids, *see General Engineering Corp.* at 805 F.2d at 95, and it follows that VIPA's perceived concerns regarding Sea Air constituted a rational basis for rejecting the Sea Air bid. This result is supported by *NKF Engineering, Inc. v. United States*, 805 F.2d 372 (Fed.Cir.1986) (holding that decision not to award to lowest bidder based on appearance of impropriety was not irrational).

■■■ Further, as in *Urban Sanitation Corp.*, "[t]here is no evidence other than the conclusory suggestion of the plaintiff, that the decision was other than rationally based." *Id.* Given the uncontroverted facts regarding VIPA's decision, the Court concludes that VIPA's actions were rationally related to its legitimate goal of restoring reliable and safe seaplane service to the United States Virgin Islands. A district court may not substitute its judgment for an agency's, but rather may act only when the agency's decision is found to be irra-

---

68 L.Ed.2d 223 (1981) (articulating the balancing test and factors to be applied in evaluating procedural due process claims).

**12.** Under Alabama law, municipalities are required to award contracts to the lowest responsible bidder who complies with reasonable regulations prescribed before bidding. *See* Section 11–47–6(a) Code of Alabama 1975.

tional. *Coco Brothers, Inc. v. Pierce,* 741 F.2d 675 (3d Cir.1984); *Princeton Combustion Research Laboratories, Inc. v. McCarthy,* 674 F.2d 1016 (3d Cir.1982). In other words, the Court cannot substitute its judgment simply because it might have reached a different decision. VIPA's actions do not so lack rationality that they constitute impermissible denials of equal protection or due process. *See Rogin* at 688. In fact, VIPA has demonstrated that it acted rationally in refusing the Sea Air proposal. Therefore, summary judgment must be entered in favor of VIPA on Sea Air's due process and equal protection claims.

### D. *Commerce Clause And Federal Aviation Act Claims.*

■ Sea Air's complaint also raises claims under the Commerce Clause of the U.S. Constitution. Specifically, Sea Air alleges that "[b]y deciding to exclusively lease the seaplane ramps, defendant VIPA is regulating interstate and foreign commerce in violation of the Commerce Clause of the U.S. Constitution. By deciding to exclusively lease the seaplane ramps, defendant VIPA is discriminating against interstate and foreign commerce in violation of the Commerce Clause of the United States Constitution." *See* Sea Air's Third Amended Complaint at Count III, ¶ 31–33. On its face, this claim lacks merit.

When "state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce." *White v. Massachusetts Council of Construction Employers, Inc.,* 460 U.S. 204, 213, 103 S.Ct. 1042, 1047, 75 L.Ed.2d 1 (1983) (holding that Commerce Clause did not prevent City of Boston from giving effect to Mayor's Executive Order requiring all construction projects funded with municipal monies to be performed by a workforce at least half of whom were bona fide residents of Boston), *citing Southern Pacific Co. v. Arizona,* 325 U.S. 761, 769, 65 S.Ct. 1515, 1520, 89 L.Ed. 1915 (1945). "The limitations on state authority created by the Commerce Clause cannot be ascertained without reference to the relevant federal law." *Norfolk Southern Corporation v. Oberly,* 822 F.2d 388, 393 (3d Cir. 1987) (upholding Delaware's coastal zone statute which banned product transfer facilities from operating on the Delaware coast). Here, the relevant federal statute is the Federal Aviation Act ("FAA"), 49 U.S.C.App. § 1301 *et seq.* (1990), which regulates interstate air transportation. Further, under 49 U.S.C.App. § 1305(d), there is no question that the Virgin Islands is subject to the requirements of the FAA.

As VIPA's actions are specifically authorized under the FAA, there can be no question that Sea Air's Commerce Clause claim fails. *See White,* 460 U.S. at 213, 103 S.Ct. at 1047. Here, plaintiff Sea Air bases its claim on the argument that "[t]he United States Congress has occupied the field of commerce dealing with aviation and, in particular, the field of regulation of facilities used in aviation commerce." *See* Third Amended Complaint at ¶ 33. Specifically, Sea Air relies on 49 U.S.C.App. § 1305(a)(1) which states:

> [e]xcept as provided in paragraph (2) of this subsection, no State or political subdivision thereof and no interstate agency or political agency of two or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier having the authority under subchapter IV of this chapter to provide air transportation.

*Id.*

A corollary to this federal preemption, however, is the qualification that:

> [n]othing in subsection (a) of this section shall be construed to limit the authority of any State or political subdivision thereof or any interstate agency or political agency of two or more States as the owner and operator of an airport served by an air carrier certificated by the Board to exercise its proprietary powers and rights.

49 U.S.C.App. § 1305(b)(1).

In this case, VIPA possessed proprietary powers and rights under 29 V.I.C. § 543. In relevant part, 29 V.I.C. § 543 states:

[t]he purposes of the Authority shall be to establish, acquire, construct, develop and improve, own, operate and manage any and all types of air and marine terminals; to control the harbors of the Virgin Islands other than controlling the mooring and anchoring of vessels as defined in Title 25, chapter 16, Virgin Islands Code; and to make available the benefits thereof in the widest economic manner, thereby promoting the general welfare and increasing commerce and prosperity. The Authority is granted and shall have and may exercise all rights and powers necessary or convenient for carrying out the aforesaid purposes, including but without limiting the generality of the foregoing ...

*Id.*

Further, 29 V.I.C. § 543(6) empowers VIPA to lease property subject to the approval of Virgin Islands Legislature.

The language of 29 V.I.C. § 543 evinces a legislative intent by the Virgin Islands Legislature to empower VIPA with proprietary power, including the power to lease the seaplane ramps in question. Therefore, under 49 U.S.C.App. § 1305(b), VIPA's actions were removed from the dictates of 49 U.S.C.App. § 1305(a). This result is supported by *Montauk–Caribbean Airways, Inc. v. Hope,* 784 F.2d 91, 96–97 (2nd Cir.1980) (holding that town when exercising proprietary rights as owner and operator of an airport could not be compelled to allow airline to serve as a fixed-base operator or to lease airline equipment and services that would permit airline to operate year-round service) and *Western Air Lines, Inc. v. Port Authority New York and New Jersey,* 817 F.2d 222, 226 (2nd Cir.1987) (affirming district court's conclusion that port authority's enforcement of local perimeter rule prohibiting nonstop flights to or from airport in excess of 1500 miles was within port authority's proprietary powers under 49 U.S.C.App. § 1305).

As VIPA was acting within its proprietary powers under 29 V.I.C. § 543 and was therefore permitted to enter into an exclusive leasing arrangement under 49 U.S.C.App. § 1305, Sea Air's claim under the Commerce Clause claim fails under *White v. Massachusetts Council of Construction Employers, Inc.,* 460 U.S. 204, 213, 103 S.Ct. 1042, 1047, 75 L.Ed.2d 1 (1983). Thus, the Court need not address the merits of Sea Air's Commerce Clause arguments under *Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986).[13]

### III.  CONCLUSION

For the reasons stated above, I shall grant defendant VIPA's motion for summary judgment and deny plaintiffs' cross-motion for summary judgment and motion for preliminary and permanent injunction and summary judgment on the complaint for declaratory relief.

---

**13.**  The Court further notes that plaintiff Sea Air cannot assert a separate claim that VIPA's exclusive lease violates the FAA for two reasons. First, Sea Air lacks standing to prosecute an action under the preemption provisions of the Federal Aviation Act.  *See Air Transport Association of America v. Public Utilities Commission of State of California,* 833 F.2d 200, 207 (9th Cir.1987) (holding that 49 U.S.C.App. § 1305(a) creates no private right of action).  Second, VIPA's challenged actions fall within the proprietary powers of airport operators, *see Western Air Lines, Inc. v. Port Authority New York and New Jersey,* 817 F.2d 222, 226 (2nd Cir. 1987); 29 V.I.C. § 543, and therefore are exempt from the preemption provisions of § 1305(a).  *See* 49 U.S.C.App. § 1305(b).